1  Grenville Pridham, SBN 120695
   grenville@grenvillepridham.com
2  2230 West Chapman Avenue
   Orange, CA 92868
3  Phone:  714-486-5144
   Christopher V. Langone, **(PRO HAC VICE)**
4  langonelaw@gmail.com
   The Langone Law Firm
5  925 Forest Ave 1-E
   Evanston, IL 60202
6  607-592-2661
   James P. Batson, **(PRO HAC VICE)**
7  jamespbatsonlegal@gmail.com
   8 Bedford Road
8  Katonah, NY 10536
   (914) 523-2278
9  Attorneys for Plaintiffs,
   FRANK SLOBIG and JUDY SLOBIG

10              UNITED STATES DISTRICT COURT

11            CENTRAL DISTRICT OF CALIFORNIA

12

| | |
|---|---|
| 13  FRANK SLOBIG and JUDY SLOBIG, | Case No. 2:15-cv-3788 |
| 14       Plaintiffs, | |
| 15  v. | COMPLAINT FOR: |
| 16  KEN SONNENBERG; DAVID | (1) Deceptive Acts and Practices, |
| 17  BEVAN; JESSICA BJARNSON; |   under Utah Code Ann.  § 13-11-4 |
|     PHILIP GANNUSCIA; CHAD | |
| 18  HUNTSMAN; THOMAS RISKAS; | (2) Unconscionable Acts and Practices |
|     BABATA SONNENBERG; JASON |   under Utah Code Ann.  § 13-11-5 |
| 19  FACKRELL; AUSTIN BAWDEN; | |
|     TREVOR SHIPP; JAMES RYAN; | (3) Deceptive Trade Practices |
| 20  NICOLAS WELCH; DANIEL |   under Nev. Rev. Stat. § 598.09 *et* |
|     WELCH; JEFFERY WARREN; | *Seq.* |
| 21  WENDY BYFORD; GARY BAUER; | |
|     MARTIN PETTIT; KARI ARAGON; | (4) Racketeer Influenced and Corrupt |
| 22  RANDY LANG; JEFFERY |   Organizations Act [Rico], |
|     SPANGLER; ERIK GANTZ; E- |   under 18 U.S.C.  §1962(c) |
| 23  BUSINESS SOLUTIONS, LLC; | |
|     DAEUS FINANCIAL; APPLY | (5) the Credit Repair Organizations |
| 24  KNOWLEDGE, LLC; eVERTEX | Act, under 15 U.S.C. §1679b |
|     SOLUTIONS; YOUR ENTITY | |
| 25  SOLUTION, LLC; SUPPLIER | |
|     SOURCE, LLC; SEED | |
| 26  CONSULTING, LLC; STRATEGIC | |
|     TAX SERVICES; and GAYTAN, | |
| 27  BAUMBLATT, & LEEVAN, LLP | Demand for Jury Trial |
| 28       Defendants. | |

Plaintiffs, FRANK SLOBIG and JUDY SLOBIG (hereinafter variously referred to as "the Slobigs" or "Frank" or "Judy"), by and through their attorneys, bring this Complaint against a group of individuals and entities responsible for bilking consumers out of money using "work-at-home" schemes, including so-called internet business consulting, corporate organization consulting, and "venture capital" scams.  For months, beginning in July 2013, Defendants victimized Plaintiffs, collecting thousands of dollars in fees and destroying their credit.

For years prior to 2013, Defendants have set up sham and shell entities, and frequently changed the name of these entities after the accumulation of Better Business Bureau ("BBB") complaints, attorney-general complaints and investigations, consumer protection agencies, FTC investigations and injunctions, and/or receiverships.  Defendants are criminals and racketeers that have enriched themselves in the amount of tens of millions of dollars at the expense of hundreds, if not thousands of consumers – often the elderly and retired.

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because it is a civil action arising under the federal laws of the United States, namely 18 U.S.C. §1964, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and 15 U.S.C. §1679, the Credit Repair Organizations Act ("CROA").

2.     Additionally, the Court has diversity jurisdiction under 28 U.S.C. §1332, because the Parties are citizens of different states, and because the matter in controversy exceeds $75,000.00.

3.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because Plaintiffs currently reside in this District, a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, and three of the Defendants can be found in this District.  Furthermore, the corporation set up by Defendants (Serve Ventures, LLC) as part of Defendants' scam is a California limited liability

1
2
3
4

company, and the so-called internet business model advocated by Defendants

involves buying and selling merchandise on the website operated by Ebay, Inc., a

Delaware corporation with its principal place of business in California.  Therefore,

a substantial amount of relevant evidence is located in or near this District.

5

6

## NATURE OF THE ACTION

7
8
9
10
11
12
13
14
15
16
17
18

4.    This action arises from the coordinated acts of multiple individuals

and entities engaging in common enterprises to conduct racketeering activities to

cheat the Slobigs out of money that the defendants obtained by fraud and

deception.  The Defendants first cheated the Slobigs out of their savings and when

the savings was exhausted the defendants then submitted credit applications to

credit cards, which the Slobigs were induced to sign under false pretenses.  After

the Defendants obtained more than $50,000 of available credit in the name of the

Slobigs, the Defendants then methodically charged the full account balances to

various business entities, owned, operated, and controlled by the defendants. The

Defendants' conduct constitutes racketeering activity under 18 U.S.C.  §1964, the

Racketeer Influenced and Corrupt Organizations Act ("RICO"), and 15 U.S.C.

§1679, the Credit Repair Organizations Act ("CROA").

19
20
21
22
23
24
25

5.    The Defendants' fraud, deception, and false promises to the Slobigs in

connection with the businesses marketed by the Defendants is willful, oppressive

and malicious, and is intended to cause confusion to the Slobigs.  To halt the

Defendants' deceptive and fraudulent acts and compensate the Slobigs for the

ongoing harm that the Defendants intentionally caused, the Slobigs are entitled to

injunctive relief and profits, actual and/or statutory damages, treble damages,

punitive damages and attorneys' fees in this exceptional case.

26
27
28

SLOBIGS' COMPLAINT; Demand for Jury Trial

## THE PARTIES

6.    Plaintiffs, FRANK SLOBIG and JUDY SLOBIG, ("the Slobigs"), are natural persons, and are married to each other.

7.    The Slobigs are citizens of the State of Indiana, and currently reside in California.

8.    Mr. Slobig is 79 years old.

9.    Mrs. Slobig is 73 years old.

10.    Defendant KEN SONNENBERG, is a natural person, domiciled in Orem, Utah.  He is, therefore, a citizen of the State of Utah.

11.    Defendant Ken Sonnenberg directs an entity called E-Business Solutions, ("EBS").  EBS is one of many entities used by Ken Sonnenberg to implement his fraudulent schemes.

12.    Before and during some of the events alleged in this complaint, Ken Sonnenberg was an officer, director, and/or owner of Defendants APPLY KNOWLEDGE, LLC, and eVERTEX SOLUTIONS, LLC.

13.    On information and belief, Defendant E-BUSINESS SOLUTIONS, LLC, ("EBS") is related to the "EBS" entity that dealt with the Slobigs. Nevertheless, according to the corporation search feature on the Utah Secretary of State's website, EBS (entity number 207443-0160 with an address of 763 S.  600 W., Orem, UT 84508) did not renew its corporate status as of 2007, and thereafter was not licensed to do business.

14.    Accordingly, EBS is a sham entity, undercapitalized, and in disregard of corporate formalities.  Any corporate veil should therefore be disregarded.

15.    Defendant APPLY KNOWLEDGE, LLC, ("Apply Knowledge" also doing business as "Apply Knowledge Institute" and "Coaching Department"), is a closely-held Utah limited liability company incorporated on July 20, 2009, with a principal place of business at 1353 West 1980 North, Provo, Utah.  Apply Knowledge, through its sham successor entity EBS, has advertised, marketed,

distributed and sold throughout the United States Defendants' business coaching programs using the wires and telephones.

16.    Defendant eVERTEX SOLUTIONS, LLC, (eVertex"), is a closely held two-member Utah limited liability company incorporated on March 29, 2001, with a principal place of business at 1352 West 1980 North, Provo, Utah.

17.    Defendant DAVID GREGORY BEVAN, ("Bevan"), is domiciled in Eagle, Idaho.  He was, at relevant times, the owner, and CEO of eCommerce Support.  At times relevant to this complaint, acting alone, or in concert with others, he has formulated, directed, controlled, and/or had the authority to control, or participated in the acts and practices set forth in this Complaint.

18.    Defendant JESSICA BJARNSON, ("Bjarnson"), is domiciled in Herriman, Utah, and is married to Defendant Phillip Gannuscia.  She was an owner of Novus North, another sham entity utilized in the *Apply Knowledge* scheme, from 2009 to 2011.  At times relevant to this complaint, acting alone, or in concert with others, she has formulated, directed, controlled, or had the authority to control, or participated in the acts and practices set forth in this Complaint.

19.    Defendant PHILIP EDWARD GANNUSCIA, ("Gannuscia") is domiciled in Herriman, Utah, and is married to Defendant Bjarnson.  At times relevant to this Complaint, he has directed Defendant-related shell entities, such as Dominion, Essent Media, Novus North, and Vensure.  At times relevant to this complaint, acting alone, or in concert with others, he has formulated, directed, controlled, or had the authority to control, or participated in the acts and practices set forth in this Complaint.  Gannuscia has been involved in operations such as "webfortune vault," "Clicks to Cash," "Education Training Online," "Online Profit Masters," "Income Masters Institute," and "Income Case Machine."

SLOBIGS' COMPLAINT; Demand for Jury Trial

20.   Defendant CHAD STEVEN HUNTSMAN, ("Huntsman") is domiciled in South Jordan, Utah.  At times relevant to this complaint, acting alone, or in concert with other, he has formulated, directed, controlled, or had the authority to control, or participated in the acts and practices set forth in this Complaint.  He has directed or managed shell entities operated by the other Common Enterprise Defendants.

21.   Defendant THOMAS JAMES RISKAS, III, ("Riskas"), is domiciled in Provo, Utah.  On behalf of Defendants, he has opened several merchant and other bank accounts that received funds from Defendants and which facilitate Defendants' collection of payments from injured consumers.  Riskas manages the scheme's bank accounts to disperse consumer chargebacks and conceal Defendants' practice from issuing banks and law enforcement.

22.   Defendant BABATA MINK SONNENBERG, ("Mrs.  Sonnenberg") is domiciled in Orem, Utah, and is married to Defendant Ken Sonnenberg and resides with him in Utah.  Mrs. Sonnenberg contributes to the day-to-day operation of Apply Knowledge/eVertex/E-Business Solutions and has formulated, directed, controlled, or had the authority to control, or participated in the acts and practices set forth in this Complaint.  She has directed or managed shell entities operated by the other Common Enterprise Defendants.

23.   Defendant YOUR ENTITY SOLUTION ("YES") is a Nevada limited liability company incorporated on May 27, 2005 with its principal place of business at 6440 Sky Pointe Drive in Las Vegas, Nevada.  YES participated in, benefitted from, and capitalized on the Apply Knowledge scam by receiving referrals from other Defendants for illusory, fraudulent, and overpriced business consulting services.

24.   Defendant STRATEGIC TAX SERVICES, LLC, ("Strategic Tax Services") is a California limited liability company, with its principal place of business at 11400 W.  Olympic Blvd., 16th Floor, Los Angeles, CA 90064.

Strategic Tax Services participated in, benefitted from, and capitalized on the Apply Knowledge scam by receiving referrals from other Defendants for illusory, fraudulent, and overpriced "tax consulting" services.

25.    Defendant DAEUS FINANCIAL SERVICES, LLC, ("DAEUS"), is a Nevada limited liability company, with a principal place of business at 172 14075 South Suite #101, DAEUS, Draper, Utah.

26.    Defendant RANDY J.  LANG ("Lang") is a manager of DAEUS LLC.  Defendant Lang is domiciled in Draper, Utah, and is a citizen of Utah.

27.    Defendant JEFFERY D.  SPANGLER ("Spangler") is a manager of DAEUS LLC.  Defendant Spangler is domiciled in Draper, Utah, and is a citizen of Utah.

28.    Lang and Spangler are alleged to be personally liable with all other Defendants under the common enterprise

29.    Lang and Spangler are alleged to be personally liable with all other Defendants under the common enterprise doctrine.  Lang and Spangler are further alleged to be personally liable as the managers of DAEUS because the corporate veil should be pierced on account of Defendants' disregard of corporate formalities, changing of corporate names, undercapitalization of assets, commingling of assets and liabilities, and intent to defraud, all as alleged in detail in this Complaint.

30.    DAEUS' registered agent is Defendant YES, one of the numerous sham entities that were engaged in the scheme to defraud Plaintiffs.

31.    Defendant SEED CONSULTING, LLC, uses the name "Seed Capital Corp." on its website.  There is no corporate entity called "Seed Capital Corp." Instead, there is an entity called Seed Consulting, LLC of whom Defendant ERIK GANTZ ("Gantz"), 3037 Warm Springs Road, Las Vegas, Nevada, is the registered agent.  According to the domain-name look-up service, "Whois.com" Defendant Gantz is the registered owner of the URLs www.seedcapital.com and

1   "businessloan.org."  Seed Consulting, LLC, also maintains an address at 9065
2   South Pecos Drive, Suite 260, in Henderson Nevada 89074.  SEED
3   CONSULTING, LLC and Gantz are citizens of the state of Nevada.

4       32.    Defendant SUPPLIER SOURCE, LLC, ("Supplier Source"), is a
5   closely held, single-member Utah limited liability company, incorporated on
6   December 15, 2011, with its principal place of business at 1352 West 1980 North,
7   Provo, Utah.  In the *Apply Knowledge* case, Supplier Source held itself out as a
8   purported division of Apply Knowledge d/b/a the Coaching Department.

9       33.    Defendant JASON FACKRELL, ("Fackrell"), is domiciled in Utah,
10  and is a citizen of Utah.  He was assigned to "coach" the Slobigs and
11  communicated extensively with them by email and telephone throughout the period
12  relevant to this Complaint.  Mr. Fackrell made numerous misrepresentations and
13  committed numerous predicate acts of fraud, described in detail herein.

14      34.    Defendant AUSTIN BAWDEN, ("Bawden"), is domiciled in Utah,
15  and is a citizen of Utah.  He conducted initial telephone "interviews" with the
16  Slobigs, and committed numerous acts of fraud intended to induce them to
17  purchase "services" from Mr. Sonnenberg's various entities.

18      35.    Defendant TREVOR SHIPP, ("Shipp"), is domiciled in Utah, and is a
19  citizen of Utah.  He communicated with and made misrepresentations to the
20  Slobigs about the enforcement actions taken by the Federal Trade Commission
21  against some Defendants.

22      36.    Defendant JAMES RYAN, ("Ryan"), on information and belief, is
23  domiciled in Utah, and is not a citizen of Indiana.  He participated in the scheme to
24  defraud the Slobigs by upselling them additional fraudulent services and coaching.

25      37.    Defendant NICHOLAS WELCH is domiciled in Nevada, and is a
26  citizen of Nevada.  At relevant times, he held himself out as a "Credit Advisor"
27  with Defendant DAEUS Financial.  He aided and abetted the scheme, as alleged
28  herein and was directly involved in the conduct alleged to violate the CROA.

1
2
3
4

38.    Defendant DANIEL WELCH is domiciled in Nevada, and is a citizen of Nevada.  He was also identified as the owner of the domain name "mysuppliersource.com," and is believed to be the person who operates Supplier Source, LLC.

5
6
7
8

39.    Defendant JEFFERY WARREN ("Warren"), on information and belief, is domiciled in Utah, and is not a citizen of Indiana.  Warren made numerous misrepresentations via email to the Slobigs in connection with Defendant DAEUS' credit repair scheme.

9
10
11
12
13
14

40.    Defendant KARI ARAGON is domiciled in Nevada, and is a citizen of Nevada.  Defendant Aragon is associated with Defendant SEED CONSULTING, LLC and was the individual with whom the Slobigs dealt in relation to SEED CONSULTING, LLC.  Aragon made numerous misrepresentations and committed, assisted in committing, or conspired to commit multiple unfair, unconscionable, and deceptive acts.

15
16
17
18
19
20
21

41.    Defendant WENDY BYFORD and her husband, Defendant GARY BAUER, are the founders of Defendant YES and are the individuals with whom the Slobigs dealt in relation to YES.  Byford and Bauer each made misrepresentations to the Slobigs, including but not limited to misrepresentations about the nature and value of the services YES purported to offer.  On information and belief, Byford and Bauer reside in Nevada and are not citizens of the State of Indiana.

22
23
24
25
26
27

42.    Defendant MARTIN PETTIT, on information and belief, is a resident and citizen of the State of California.  Pettit is associated with Defendant Strategic Tax Services, and was the individual with whom the Slobigs interacted while engaged with Strategic Tax Services.  In this role, Pettit made deceptive statements to and committed unconscionable and otherwise unfair acts against the Slobigs, including but not limited to grossly overcharging them for illusory tax services.

28

SLOBIGS' COMPLAINT; Demand for Jury Trial

43.     Defendant Pettit is a Tax Account Manager for Defendant GAYTAN, BAUMBLATT, & LEEVAN, LLP, a tax accounting firm and purported limited liability partnership that shares a principal place of business with Defendant Strategic Tax Services at 11400 W.  Olympic Blvd.  in Los Angeles, California.

44.     On information and belief, one or more partners at Gaytan, Baumblatt, & Leevan, including but not necessarily limited to Ray Gaytan, are aware of the Strategic Tax Services scam and have directly participated in the scam by preparing tax documents under the name "Strategic Tax Services, Inc."

45.     All individual Defendants named herein were associates, employees, or partners of Ken Sonnenberg and participated with him in various ways in the scheme perpetrated against the Slobigs.  These Defendants committed, caused to be committed, conspired to commit, or otherwise participated in the unfair, deceptive, and fraudulent activities, as alleged herein.

## BACKGROUND INFORMATION ON THE SONNENBERG FAMILY

46.     The Sonnenberg family has been involved in such schemes for over a decade, going as far back as 2003 when Ken worked with his brother, Steve Sonnenberg, who ran an almost identical common enterprise scheme, known as "Ivy Capital," that "through an interconnected web of 22 companies, marketed business coaching and related services to consumers throughout the United States" (See Exhibit 1, Brief of the Federal Trade Commission in 13-16052, *FTC v. Ivy Capital* (9th Cir.), hereinafter referred to as the  "*Ivy Capital* case.")

47.     Relevant allegations in this Complaint are based on the record citations made in Exhibit 1, an appeal brief seeking that the Ninth Circuit affirm a summary judgment against defendants in *Ivy Capital*), all material allegations contained in Exhibit 1, and supported by the factual record citations therein, are part of the extensive pre-suit investigation conducted by the Slobigs, and evidence of the pattern of wire fraud and bank fraud that forms the basis of the RICO counts,

Therefore, <u>Exhibit 1</u>, and its accompanying record citations, are incorporated by reference in this complaint.

48.    Although Steve Sonnenberg ran , Defendant Ken Sonnenberg was involved in the scheme, and has now taken over after his brother was enjoined from running this scheme in the  case.

## RELEVANT  LITIGATION  AGAINST
## APPLY KNOWLEDGE and eVERTEX SOLUTIONS

49.    Defendants Apply Knowledge and eVertex Solutions were sued by the FTC for a Permanent Injunction pursuant to Section 13(b) and 19 of the Federal Trade Commission Act, 15 U.S.C.  53(b) and 57b in connection with conduct almost identical to that alleged in this Complaint. *See* U.S.  Dist.  Utah, Case Number 14-0088.  The FTC alleged:

> Defendants operate, as a common enterprise, a multi-phase, multi-million dollar Internet and telemarketing scheme that preys on consumers hoping to earn money via a home-based Internet business.  Defendants, using a multitude of corporate names and oft-changing d/b/as rely on deceptive tactics, mail fraud, and wire fraud, to induce consumers to pay thousands of dollars – most of it borrowed on their credit cards – for Defendants' services and related goods.  Consumers make these purchases based on Defendants' representations that they will end up with an online business generating substantial revenue.  Yet despite Defendants' assurances, most consumers who purchase Defendants' services and related goods do not end up with a functional online business, earn little or no money, and end up heavily in debt.

(See <u>Exhibit 2</u>, Complaint filed by Federal Trade Commission, 14-0088, hereinafter the *Apply Knowledge* case).

50.    <u>Exhibit 2</u> is incorporated into this complaint.  Relevant allegations in the instant complaint are based on allegations made by the FTC in the *Apply Knowledge* case, which was part of the extensive pre-suit investigation conducted by the Slobigs, and evidence of the pattern of wire and bank fraud that form the basis of the RICO counts.

51.    On February 11, 2014, the federal judge in *Apply Knowledge*, case No.  14-0088 in the U.S.  District Court for the District of Utah, found that there

SLOBIGS' COMPLAINT; Demand for Jury Trial

existed good cause to believe that Mr. Sonnenberg — along with his business associates, the Common Enterprise Defendants — "have engaged and are likely to engage in acts and practices that violated Section 5(a) of the FTC Act, 15 U.S.C. 45(a) and the FTC Trade Regulation rule commonly known as the "Telemarketing Sales Rule," 16 C.F.R.  Part 310.  (See <u>Exhibit 3,</u> Temporary Restraining Order, Asset Freeze, Appointment of a Temporary Receiver, Immediate Access, and Order to Show Cause Why a Preliminary Injunction Should Not Issue, Dist.  Utah No.  2:14-0088, Doc.  16)

52.    <u>Exhibit 3</u> is incorporated into this Complaint by reference.  Relevant allegations in the instant Complaint are based on the complaint filed by the FTC in that action, the examination of which was part of the extensive pre-suit investigation conducted on behalf of Plaintiffs by counsel, and which is evidence of the pattern of wire fraud and bank fraud that form the basis of the RICO counts.

53.

## THE COMMON ENTERPRISE

54.    The Common Enterprise Defendants have conducted the business practices described herein through an interrelated and interdependent network of companies that have a common business purpose, routinely share profits from the illegal and deceptive business scheme described in this Complaint, and in many instances have common ownership, officers, managers, business functions, employees, and office locations.  Because the Common Enterprise Defendants so operate, they are jointly and severally liable.

55.    Like in the *Ivy Capital* case, the Common Enterprise Defendants herein "shared resources and personnel, collaborated on key aspects of their operations, and presented themselves to consumers with unified branding and advertising.  They collaborated closely – each one providing services necessary to the success of the entire scheme and treating each other as divisions or departments, rather than as separate corporate entities." <u>Exhibit 1</u>, p.  8.  The

SLOBIGS' COMPLAINT; Demand for Jury Trial

factual specifics of such conduct in this case are alleged in detail throughout this Complaint, and include but are not limited to:

(a)   Use of domain names registered to other entities without using those entity names;

(b)   Sharing of information;

(c)   Sharing of resources;

(d)   Sharing of employees;

(e)   Recycling of "webinars" and materials;

(f)   The referral networks and payment scheme; and

(g)   The operation of the scheme as alleged herein, and in the *Apply Knowledge and Ivy Capital* cases, which involve many of the same individuals.

56.   A Temporary Receiver was appointed over a number of corporations, including those operated by Sonnenberg: Apply Knowledge, LLC, and eVertex Solutions, LLC, among others.  (See Exhibit 4, Report of Temporary Receiver in *Apply Knowledge*).

57.   Exhibit 4 is incorporated into this Complaint by reference.  Relevant allegations in the instant Complaint are based on this Receiver's Report, which was examined as part of the extensive pre-suit investigation conducted on behalf of Plaintiffs by counsel and contains evidence of the pattern of wire and bank fraud that form the basis of the RICO counts.

58.   Several of the entities identified in Exhibit 4 were directly involved in the unfair and deceptive actions that injured the Slobigs, as alleged more fully and specifically herein.

59.   The Receiver conducted an investigation, interviewed relevant individuals, including Defendant Ken Sonnenberg, and visited the premises from which the Slobigs were defrauded at 1495 W.  500th, Linden Utah.

60.    According to the Receiver's investigation, Defendants have set up over 240 entities or d/b/as according to the information and documents then available to the Receiver.  But even this list is incomplete, as it did not include some of the entities that defrauded Plaintiffs, including, for instance, DAEUS Financial.  See Exhibit 4, Tab 1.  This is evidence of the pattern of bank fraud that forms the basis of the RICO counts.

61.    Defendants and their sham entities have moved, commingled, and laundered money through more than 350 different bank accounts.  See Exhibit 4, Tab 2.  This is evidence of the pattern of bank fraud that form the basis of the RICO counts.

62.    Defendants and their sham entities have charged consumers' credit cards through over 500 merchant accounts.  See Exhibit 4, Tab 3.  This is evidence of the pattern of bank fraud that form the basis of the RICO counts.

63.    As alleged herein, the Slobigs were directed to use a website with the URL www.applyki.com.  This is evidence that Defendants are a common enterprise, hold themselves out as one company with divisions, and the sharing and co-mingling of assets, including IP such as webinars and URLs.

64.    According to the "Whois" domain-lookup service, the registrant of www.applyki.com is Defendant eVertex Solutions, LLC and the Administrator of the website is Defendant Ken Sonnenberg.

65.    Sonnenberg, along with some of his business associates or former business associates, were profiled in the cover-story of Salt Lake Week on June 20, 2012, in a story called: "Phone Predators: Utah's telemarketing wolf packs." *See*, http://www.cityweekly.net/utah/phone-predators/Content?oid=2161659&showFullText=true.  A copy of this article is attached as Exhibit 5.  The material factual allegations in Exhibit 5 are part of the basis of Plaintiffs' allegations, and evidence of the pattern of conduct that forms

SLOBIGS' COMPLAINT; Demand for Jury Trial

the basis of the RICO claims.  Accordingly, the allegations of the article are incorporated by reference herein as evidence of the pattern of racketeering activity.

## FACTUAL ALLEGATIONS

66.     During the majority of the period relevant to this Complaint, Mr. Slobig was employed at Holy Rosary Parish in Port Chester, New York where he temporarily resided and was an outreach coordinator for approximately 18 months.

67.     The Slobigs have spent the last several decades of their lives in public service, participating in charity and missionary work both overseas and at home.

68.     As a result, the Slobigs have lived a modest lifestyle since moving out of their Washington, DC area home in 2006, serving for 15 months with a program for street kids in Quito, Ecuador, then moving about this country in a camper and settling in Indiana, and subsequently in New York, and, currently, California.

69.     Mrs. Slobig worked for several years as an international disaster relief responder and conflict resolution specialist in numerous European, African and Asian countries ravaged by natural disasters or civil strife.  Due to health issues discussed below, Mrs. Slobig was unable to earn any income during or since the period relevant to this Complaint.

70.     Mr. Slobig ceased his employment at Holy Rosary Parish in March 2014.  The Slobigs subsequently relocated from New York to California in June 2014, and Mr. Slobig has not had gainful employment since.

71.     Other than that which is described above, the Slobigs did then and still do subsist primarily off of income from their social security benefits and the rental of the aforementioned home in Washington, DC, totaling slightly less than $5,000 per month, on average.

72.     In their retirement years with limited income and extensive health expenses, the Slobigs are of the - formally - "middle class" income bracket that now could fairly be characterized as "insurance poor" - nearly half of their monthly income goes to the payment of various insurance premiums.

73.     In February 2015, the Slobigs met with a personal financial advisor employed with Bank of America.

74.     This advisor informed the Slobigs that based upon their financial situation they could spare no more than $800 per month in disposable income.  As alleged herein, this amount is consumed entirely by the monthly credit payments that Plaintiffs are currently forced to pay in order to mitigate damages inflicted by Defendants' conspiracy.

75.     Beginning in or around the spring of 2010, Mrs. Slobig began experiencing serious health problems, the effects of which are still lingering.

76.     Specifically, Mrs. Slobig was diagnosed with breast cancer in April of 2010.

77.     Subsequently, Mrs. Slobig developed heart problems, and had a pacemaker implanted in January 2011.

78.     On December 31, 2011, while in Panama, Mrs. Slobig suffered a heart attack.

79.     Although Mrs. Slobig has partially recovered, and her cancer is in remission, medical bills stemming from her illness and the lingering side-effects were substantial.  As a result, the Slobigs' financial situation was, and still is, strained.

80.     Before their encounter with Defendants as alleged herein, the Slobigs stayed out of debt, paid credit-card and other bills on time, and otherwise maintained good-to-excellent credit.

81.     Here, as in *Apply Knowledge*, Defendants used (and continue to use) deceptive Internet sites to attract consumers interested in work-at-home opportunities.

82.     On July 30, 2013, the Slobigs responded to an on-line promotion (most likely a click-through internet "banner" advertisement) about starting a home-based Internet business.

SLOBIGS' COMPLAINT; Demand for Jury Trial

83.   The promotion indicated that for only $97.00 consumers could learn about how to make money on the Internet, from their home, requiring only 6-10 hours a week.

84.   Neither of the Slobigs had any small business experience prior to viewing this offer, much less experience with any sort of online business.

85.   Nevertheless, the offer appealed to the Slobigs because of the opportunity it purported to present to supplement their limited income with a very modest commitment, and a seemingly low cost of entry.

86.   The banner ad was substantially similar to some of the banner ads preserved by screenshots and submitted as evidence of deceptive conduct in the FTC action.

87.   The promotion prominently displayed logos from major TV networks endorsing the program as having been profiled on TV and other news and press outlets.  A similar approach to creating perception of legitimate endorsements is used by Defendant Seed Consulting, LLC, on one of its websites maintained at URL www.businessloan.org.

88.   The banner-ad promotion linked to testimonials from consumers about their purported great success with the program.

89.   On information and belief, these are fabricated testimonials.

90.   One such "testimonial" was from a middle-aged woman who talked about how she earned money by posting URL links in the amount of $15.00 per post.

91.   This is consistent with the scheme described by the FTC in the *Ivy Capital* case.  For instance, in the Ninth Circuit appeal (by one of the Defendants in *Ivy Capital* after losing the case on summary judgment), the FTC stated: "From the outset [one of the defendants' in that case] key contribution was his ability to establish contacts with 'lead generators' – in this instance, companies that advertised and sold inexpensive work-at-home programs [SER 862].  Consumers

1  who purchased these programs also provided their contact information.  Armed

2  with information about likely purchasers and their contact information, defendants

3  blasted them with repeated sales calls [SER 0001, 0011, 0031, 0132-32, 0167-68,

4  0402-05, 1311, 1034-37, 1057.] These record citations from the Ninth Circuit

5  appellate record in the *Ivy Capital* case are incorporated into this complaint as

6  evidence of the pattern of conduct, including wire fraud, which forms the basis of

7  the RICO claims alleged herein.

8         92.    Just like in *Ivy Capital*, after responding to the promotion, on July 31,

9  2013, The Slobigs received a telemarketing call from one of the Common

10  Enterprise Defendants, Defendant Austin Bawden.

11        93.    Defendant Bawden claimed to be the head of an entity called

12  E-Business Solutions ("EBS").  But as alleged above, EBS was simply one of

13  many sham entities or d/b/as used by the Common Enterprise Defendants.

14        94.    In a facsimile transmission dated November 14, 2014, from Defendant

15  Apply Knowledge, LLC, to the Slobig's counsel, EBS stated: "after Frank and

16  Judy were sold and charged for the original package by Members Learning Center

17  on 7/31/13, our company provided the fulfillment on the services." This

18  demonstrates the inter-relatedness between the entities, including: Apply

19  Knowledge, and "Members Learning Center."

20        95.    Bawden advised Plaintiffs that they were highly selective as to the

21  people they worked with, and that they only worked with 2-3% of the people who

22  respond to the initial promotion.  This allegation is part of the same pattern used in

23  *Ivy Capital*, where the FTC notes "Defendants told consumers that the program

24  was exclusive and lucrative." Exhibit 1, p.  10.

25        96.    Bawden's representation regarding selectivity of clients was false.

26  The Common Enterprise Defendants will take money from anyone they

27  successfully ensnare in their scam as alleged herein.

28

SLOBIGS' COMPLAINT; Demand for Jury Trial

97.     Bawden, on behalf of EBS, again assured Plaintiffs that their time investment would not exceed 10 hours a week and would yield results promptly. Bawden specifically represented that some EBS clients generated income within 14 days.

98.     The representation that the time required would not exceed 10 hours a week was false, and Bawden knew so at the time he made the representation. Indeed, as alleged later herein, when Plaintiffs inquired about why they were not making money they were told they had to work harder and "would only get out of it what they put in" or words to that effect.

99.     Bawden advised the Slobigs that they should rely heavily on their personal credit to fund their business.  He repeatedly characterized credit as "other peoples' money(s)" – coining an acronym for the concept ("OPM").

100.    The representation that personal credit is "other peoples' money(s)" is false – of course, the Slobigs would be personally liable for paying down the credit extended to them.  This false representation was made for the purposes of priming the Slobigs to spend liberally on Defendants' sham services using their personal credit cards without concern for ultimately paying down the debt.

101.    The above is a dangerous attitude with which to approach credit, and is intended to induce victims of Defendants' scheme to harm their personal credit.

102.    As described below, forcing large charges on victims' personal credit early on becomes an integral part on Defendants' overall conspiracy during later phases involving, for instance, illegal credit repair upsells.

103.    During this conversation, EBS became aware of Mrs. Slobig's medical condition and the Slobigs' limited income.

104.    EBS was also aware of the Slobigs' lack of small business and online experience.

105.    In reliance upon Bawden's representations and assurances, the Slobigs agreed to engage with EBS.

106.   On July 31, 2013, the Slobigs entered into a contract with EBS (the "Enrollment Agreement") whereupon E-Business Solutions undertook to train and coach the Slobigs in the management of a small online business.

107.   In a July 31, 2013 phone call that preceded the signing of the Enrollment Agreement, E-Business Solutions upsold a "coaching services" package to the Slobigs called "Global Mentors", for the price of $7,095 – a far cry from the initial $97 offered in the online advertisement, which the Slobigs paid as well.

108.   Again, this bears striking resemblance to the scheme in *Ivy Capital*. As the FTC explained in its brief in that case: "Ivy Capital's telemarketers told consumers that, by trading up from the inexpensive products they had previously purchased, they would be able to establish Internet businesses that would generate substantial income and recoup their initial investment in mere months.  SER 001, 012, 0147-48, 0197-98, 636-41, 1373, 1535-37, 1545.  These record citations from the Ninth Circuit appellate record in *Ivy Capital* are incorporated into this complaint as evidence of the pattern of conduct, including wire fraud, which forms the basis of the RICO claims alleged herein.

109.   Ken Sonnenberg, here, is running the same type of scheme his brother ran in *Ivy Capital*, and which he was running in *Apply Knowledg*e.

110.   Moreover, as in *Ivy Capital*, Defendants here spun extravagant tales of clients who made thousands of dollars quickly.  (Exhibit 1, p, 9 and SER 0012, 132, 147-48, 639)

111.   Like with the Slobigs, in Ivy Capital Defendant Sonnenberg and his co-conspirators "told consumers they could achieve that much working 5-10 hours a week."

112.   For their initial $97, all the Slobigs received was the above-referenced sales pitch for the "Global Mentors" program.

113.   Defendant Jason Fackrell was assigned to be the Slobigs' "coach."

1   114.   On July 31, 2013, a person named Andy Nicholes scheduled a

2   "Welcome Call" on Thursday, August 1, 2013 between Plaintiffs and Jason

3   Fackrell.  Plaintiffs were sent an email confirming this call.

4   115.   Around the same time as the welcome call, Nicholes set up a variety

5   of programs and scripts, including "MSL" "ebay" AKI Toolkit" and "Authorize

6   and Volusion"

7   116.   On information and belief MSL stands for "Members Learning

8   Center," which was associated with Defendant Apply Knowledge, Inc.  Examples

9   of the "webinars" offered by Defendant Apply through MLC can be found at:

10  https://www.youtube.com/watch?v=7gqw6NA-Pl0,

11  https://www.youtube.com/watch?v=_HTVWGYDbNc,

12      https://www.youtube.com/watch?v=xdiegv1f_O4, and

13      https://www.youtube.com/watch?v=fELNnGy1wn4.

14  The videos contained in these URLS are incorporated herein as examples of

15  the type (and quality) of materials (and "webinars") found in the MLC.

16  117.   On August 1, 2013, Defendant Fackrell made a note that as part of the

17  welcome call he "logged them into the website," "showed them the webinars," and

18  told them to watch the "coaching success" webinars that talk about him and the

19  other coaches.

20  118.   In this same email, Fackrell noted that he was concerned that "Judy

21  asked a ton of questions about the company, [himself] and the people they select.

22  He explained he used "a lot of testimonials to get them excited."

23  119.   Many of the testimonials used by Defendants are false, (*see*, *Apply*

24  *Knowledge* Complaint, 14-0088, <u>Exhibit 2</u>, at paragraphs 51-62), which allegations

25  are incorporated herein by reference.

26  120.   The people identified in the testimonials do not exist.

27  121.   The photos used in the testimonials are stock photos.

28

SLOBIGS' COMPLAINT; Demand for Jury Trial

1

122.   The testimonials falsely represent the location of the individual by

2   reading the consumer's IP address, and then using a town or city close to the

3   consumer to falsely convey that people in the consumer's own area are

4   successfully using Defendants' programs.

5

123.   See the following link regarding Defendants' testimonial practices.

6   http://ersp.blogspot.com/2013/04/ersp-recommends-affiliate-marketer-yes.html.

7   The factual statements contained in this link, which is a recommendation of the

8   "Electronic Retailing Self-Regulation Program (ERSP), are incorporated herein by

9   reference.

10

124.   In this file note, Defendant Fackrell noted that his Skype went down

11   so he was unable to record the call.  This evidences that calls are recorded and

12   Defendants are put on notice by the filing of this complaint to preserve the

13   recordings of all calls, which Plaintiffs allege to be evidence in support of their

14   allegations of a pattern of racketeering activity.

15

125.   On August 9, 2013, Plaintiffs were asked to complete a "Client

16   Profile" in which they were asked 19 questions.

17

126.   Also, on August 9, 2013, Defendant Fackrell noted the file that

18   Plaintiffs "struggle with the simplest things."

19

127.   On August 12, 2013, Plaintiffs listed their first item on Ebay - and lost

20   money on the sale.

21

128.   On August 16, 2013, Defendant Fackrell represented to Plaintiffs they

22   could "start making 'real money' very quickly." And that he has some students

23   "making hundreds and thousands of dollars in the first month, sometimes in a

24   couple of weeks.  It depends on how much work you put into it."   This

25   representation was false and is the precise type of false financial projection that the

26   FTC alleged, and courts have found with respect to some of the Defendants

27   specifically, is a false and deceptive act.

28

129.   Defendant Fackrell also represented that "if you max out your limits on ebay and keep listing items on there then you will start making money."

130.   The representations made by Defendant Fackrell were false and deceptive and made with the intent that the Slobigs rely upon them and continue to do business with EBS, and subsequently the other entities operated by the Common Enterprise Defendants.

131.   Also, on August 16, 2013, Fackrell noted, with frustration (as inferred by the three exclamation points) that "Wendy from Entity Solutions told them it might take months to make money!!!"

132.   The exclamation point is a punctuation mark used to indicate strong feelings, such as surprise – or to visually express "shouting."

133.   The exclamation point was used three times because Fackrell was upset, or surprised, or frustrated by the fact that Wendy told Plaintiffs it might take months when he was in the process of attempting to deceive Plaintiffs into believing it would only take weeks — especially because the timing for the DAEUS upsell was looming.

134.   Yet, on August 19, 2013, Defendant Fackrell told the Slobigs in an email, "most of my students are usually making money in the first few weeks" and "I've not had one student who didn't make money on ebay." These representations were false and are precisely the type of statements that were found in the FTC actions to be deceptive and illegal, and the basis for an injunction.

135.   Indeed, as noted in the Ivy Capital case, where Ken Sonnenberg was also a defendant, "defendants could not identify even one consumer who, using the coaching program, earns back his investment quickly and made thousands within a few months, as they had promised." Exhibit 1, p. 32.

136.   On August 19, 2013, Defendant Fackrell sent the Slobigs an email telling them to expect a call from James Ryan, who was identified as "an account manager/dropshipping coach in [their] office." In this same email, Defendant

Fackrell represented that "being able to find good wholesale suppliers that dropship is the lifeblood of our business."

137.    On August 20, 2013, in response to a question about potential legal liability for conduct on Ebay, Fackrell provided incorrect and dangerous legal advice.

138.    Defendant Fackrell is not a licensed attorney and was not under the direct supervision thereof.

139.    Also, on August 20, 2013, the Slobigs were contacted by Defendant James Ryan, who identified himself as being associated with the "Coaching Department" with "Supplier Source Division," with an email jame@mysupppliersssource.com.  This is consistent with the pattern identified in *Apply Knowledge*, of misrepresenting Supplier Source as a "division" of the Common Enterprise Defendants' operation.

140.    According to the "Whois" domain-name registration look-up service, the URL www.mysuppliersource.com is registered to Defendant Daniel Welch, a purported agent of the "Apply Knowledge Institute." Defendant SUPPLIER SOURCE, LLC, is believed to be involved in the deceptive conduct associated with "mysuppliersource.com," as alleged herein.

141.    On August 26, 2013, Defendant Fackrell noted that the Slobigs were "so worried about everything." Fackrell used this knowledge of Plaintiffs' apprehension to prey on their fears and sell them more over-priced and useless services through the entities and d/b/as operated by the Common Enterprise Defendants.

142.    On August 27, 2013, after discussing Judy's medical challenges, Fackrell sent an email that stated: "Sorry to hear that you have those medical conditions.  That must be hard to deal with." He also stated "I have not doubt that you can start making money and being profitable as soon as possible.  All of my students that do their homework are making money and you will too."

1
2
3

143.   This knowledge of Plaintiffs' apprehension, medical challenges, and perceived "struggling with simple things," did not stop the Common Enterprise Defendants from continuing to bilk the Slobigs out of money.

4
5
6

144.   Indeed, as far along as August 27, 2013, Fackrell stated that he was looking forward to creating a "great success story" out of the Slobigs as he claimed to have done for "many of [his] other clients."

7
8
9
10
11
12

145.   This promise of making "success stories" is, again, the same *modus operandi* used as far back as 2003, as alleged in *Ivy Capital*.  The record in that case established: "Telemarketers pitched the program as a low-risk, short-term investment.  They assured consumers that the company was simply looking for 'success stories' to promote the company.  Exhibit 1, citing SER 46-147, 408, 634, 782.

13
14

146.   These "success stories" are a sham.  Sometimes selling even one single item on Ebay was logged as a success story.

15
16
17
18

147.   Moreover, consumers who had given positive testimonials "ultimately complained or cancelled, yet defendants kept plugging their 'success stories.'" Exhibit 1, p. 33, citing SER 819-20, 927-38, 943-1005, which are incorporated by reference into this complaint.

19
20
21
22
23

148.   On August 27, 2013, Fackrell sent the Slobigs an email that stated, in relevant part: "I just wanted to send you off a quick email congratulating you on your decision to go the direct dropshipping route with your business.  I met with James Ryan and I'm excited for you." The email also made the following representations:

24
25
26

(a)   That the decision to go direct dropshipping would "REALLY help expedite the results of your business much quicker and things will go much more smoothly";

27
28

(b)   That he would make the Slobigs a "great success story" like he had done for "many of [Fackrell's] other clients";

SLOBIGS' COMPLAINT; Demand for Jury Trial

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

    (c)    That they were working with the "top marketing experts in the business";

    (d)    "Will really help drive more consistent traffic to their website";

    (e)    That their Website design team would build their first website for them.

149.    Consistent with the pattern of conduct starting in *Ivy Capital* and continued in *Apply Knowledge* and this case, Defendants promised consumers such as the Slobigs "an 'expert' personal coach would guide them 'every step of the way'" Exhibit 1, p.  11, citing SER 31-32, 197-98, 628-29.

150.    As in *Ivy Capital*, the "coaches" promised by Defendants in this case – including Defendant Fackrell – were not experts.  They were unreliable and inexperienced.  There were no actual experts on staff and the "coaches were [and in this case are also alleged to be] just regular employees working off a template." Exhibit 1, p.  13.

151.    Coaches, including Defendant Fackrell, were not required to have their own business, have run their own business, have experience running online businesses, or even have a college degree.

152.    As alleged in more detail herein, and consistent with the pattern started in *Ivy Capital*, consumers – including the Slobigs in this case – "did not receive the 'expert' advice as promised; instead, they received fewer or shorter coaching sessions, with unhelpful and even 'useless' guidance." (See, Exhibit 1, p. 13, and record citations SER 14, 35, 48, 101, 134, 148-49, 171, which as incorporated into this complaint by reference).

153.    And as in *Ivy Capital*, "consumers who succumbed [to the] pitch by making a purchase were quickly bombarded by calls from telemarketers who offered a variety of additional products – known as 'upsells' – that they claims would help consumers establish their business and generate income quickly." Exhibit 1, p.  12.

SLOBIGS' COMPLAINT; Demand for Jury Trial

154.   As part of the next phase of the scheme, the Common Enterprise Defendants proceeded to introduce the Slobigs to Defendant Nicholas Welch, who holds himself out as a "Credit Advisor" with Defendant DAEUS Financial.  See <http://www.scambook.com/report/view/149967/Daeus-Financial-Services-Daeus-Business-Builder-Complaint-149967-for-$3,000.00>

155.   EBS represented, and DAEUS confirmed, that DAEUS would provide the Slobigs with the "critical assistance" needed to establish, maintain, and support the operation of their business.

156.   In particular, DAEUS, through Defendant Nicholas Welch, represented that its "highly-trained corporate credit team" would advise the Slobigs on how to "properly build a strong financial foundation for their business, including the delicate process of building and enhancing a business credit profile."

157.   DAEUS, through Defendant Nicholas Welch, also represented that it would shepherd the Slobigs through a three-"phase" path purporting to involve, successively, "Compliance and Registration," "Lending/Funding," and "Seasoning of Entity."

158.   As part of this path, DAEUS promised to "walk" the Slobigs "through the methodical process of increasing the business credit score, enhancing the business credit profile overall, and ultimate (*sic.*) connecting our clients to lenders with whom we have developed a relationship and recommend."

159.   DAEUS promised to "enhance" the Slobigs business credit primarily by assisting them to improve their personal credit.

160.   A major aspect of DAEUS' strategy was to conceal credit card debt incurred as direct result of the fraudulent actions of other RICO and/or Common Enterprise Defendants by moving it off of the Slobigs' personal credit.  The Slobigs had no other substantial debts on their personal credit during the relevant period.

SLOBIGS' COMPLAINT; Demand for Jury Trial

161.   Therefore, the EBS and DAEUS scams were complementary elements of the same conspiracy to defraud.

162.   Moreover, DAEUS represented that the value proposition for its services was assistance for a small business owner in disentangling his or her personal finances from those of the business.

163.   On August 28, 2013, a person named Jenna Carlson logged in Defendants' computer notes that Defendant has "Received signed MMS contract-dropbox."

164.   In reliance upon the above representations, the Slobigs paid $3,560.00 to DAEUS.

165.   The above representations were all false and therefore deceptive.

166.   DAEUS chronically overstated the necessity of the assistance they purported to provide with the relatively simple task of maintaining good business credit.

167.   DAEUS did not provide the "critical services" that it promised.

168.   DAEUS did not assist the Slobigs in properly building a strong financial foundation for their business.

169.   DAEUS did not assist the Slobigs in building and enhancing a business credit profile.

170.   DAEUS did not embark with the Slobigs upon a three-"phase" path purporting to involve, successively, "Compliance and Registration," "Lending/Funding," and "Seasoning of Entity."

171.   DAEUS did not walk the Slobigs through the process of increasing their business credit score, nor did it help the Slobigs enhance their business credit profile overall.

172.   DAEUS did not introduce the Slobigs to any "top" lenders with whom they had developed a relationship and recommended.

SLOBIGS' COMPLAINT; Demand for Jury Trial

173.   DAEUS only introduced the Slobigs to Seed Capital, which is not a top lender.

174.   The only service DAEUS provided was to introduce the Slobigs to a company that registers business entities for exorbitant fees, a business tax service, and a purported "venture capital" firm that turned out to be engaged in its own fraudulent business credit scheme: Defendants Your Entity Solutions, Strategic Tax Services, and SEED Capital, respectively.

175.   On or about September 24, 2013, Plaintiffs received a call from Small Business Success, which is believed to be a company associated with Defendants. When Mr. Slobig complained that he had not been advised that this company would be contacting him, an email was sent to "Ken" and "Dave" — believed to be Defendants Sonnenberg and Bevan concerning the issue.  This is evidence of their control of the enterprise, and the Common Enterprise and RICO Defendants.

176.   Your Entity Solutions, without the services of a lawyer (while Byford claims to hold a paralegal certification, neither Byford nor Bauer, a former sales representative, are attorneys), gave the Slobigs legal advice about what sort of business entity they should establish for their business, offering to assist them in setting up an LLC.

177.   Your Entity Solutions filed papers on behalf of the Slobigs establishing "Serve Ventures, LCC," the Slobigs' California limited liability company.

178.   Being unsophisticated consumers who had never before attempted to establish or operate a small business, the Slobigs had no knowledge of what is typically charged for the service of filing papers establishing a business entity in the State of California and relied upon the representations of Defendants Nicholas Welch and DAEUS that DAEUS would secure needed small business support services at industry-standard cost.

1

179.   This is not the first time that Your Entity Solutions and Defendant

2
Sonnenberg have been accused of participating in a RICO conspiracy to defraud

3
small business owners; YES was recently sued under RICO and the Telephone

4
Consumer Protection Act for similar conduct – except involving a telemarketing

5
scam rather than an online banner advertisement. *See, Sung v. Bussio*, (N.D.  Cal.

6
13-1786).

7

180.   Finally, Defendant DAEUS referred the Slobigs to Defendant SEED

8
Capital, which purported to offer the Slobigs assistance in raising investment

9
capital despite the Slobigs' insistence that they did not need such capital.  As

10
detailed below, SEED CONSULTING, LLC offered no such service, and instead

11
committed eight separate acts of fraud, destroying Mr. Slobig's credit in the

12
process.

13

181.   On information and belief, SEED CONSULTING, LLC and

14
Defendant Gantz are less closely-related to the Sonnenberg entities than the other

15
Common Enterprise Defendants.

16

182.   Rather, SEED CONSULTING, LLC is engaged in its own business

17
credit repair scam, in which it advertises that it will obtain a minimum of $50,000

18
in capital in support of a client's business upon completion of a multi-step

19
"homework assignment" that often requires the purchase of additional services

20
from co-conspirators.

21

183.   As described herein, Gantz's scheme contains many elements in

22
common with Nicholas Welch's DAEUS scheme, including but not limited to the

23
$50,000 capital claim, and the use of "homework assignments" to induce victims'

24
investment in the scam.

25

184.   In the case of the Slobigs, SEED CONSULTING, LLC promised to

26
obtain $50,000 in capital in the name of the Slobigs' business entity, Serve

27
Ventures LLC.

28

SLOBIGS' COMPLAINT; Demand for Jury Trial

185. As both DAEUS and EBS had also represented, SEED CONSULTING, LLC represented that obtaining such capital was an instance of the use of "O.M.," and that such funding could not have an impact on the Slobigs' personal credit.

186. When Mr. Slobig questioned the need for such a large amount of capital, SEED CONSULTING, LLC represented to him that his business would require that amount.

187. SEED CONSULTING, LLC also represented that such an amount would be easy to obtain regardless and therefore there was no reason for the Slobigs not to take advantage of the opportunity.

188. However, SEED CONSULTING, LLC did not raise $50,000 in "capital" on behalf of Serve Ventures, LLC.

189. Instead, SEED CONSULTING, LLC opened up eight different lines of credit in Mr. Slobig's name, *personally*.

190. Contrary to SEED CONSULTING, LLC's representations, and without his knowledge or authorization, Mr. Slobig was made personally liable for those credit accounts.

191. Only two of those eight accounts even included Serve Ventures, LLC as a co-signer.

192. Through these eight lines of credit, the Slobigs were damaged more than $76,000.00.

193. Because of the SEED CONSULTING, LLC damages alone, the Slobigs pay at least $800 per month in credit card payments on the $76,000 amount – the entirety of what would otherwise be the only disposable income they could spare according to Bank of America's personal financial consultant.

194. None of the entities to which DAEUS referred the Slobigs provided necessary, valuable, or even useful small business services to them in spite of the representations of DAEUS, Nicholas Welch, and EBS that they would.

SLOBIGS' COMPLAINT; Demand for Jury Trial

1    195.   In addition to shopping the Slobigs around to their fellow co-
2  conspirators, EBS and Defendant Sonnenberg continued to squeeze fees out of the
3  couple themselves.

4    196.   Specifically, as described below, EBS leveraged the Slobigs'
5  continuing failure with further deception in order to convince them to purchase two
6  additional upsells totaling more than $16,000.

7    197.   Furthermore, EBS' "coaches" continued to provide misleading,
8  dangerous, and/or illegal advice upon which the Slobigs were intended to rely, all
9  the while.

10    198.   For instance, Defendant Fackrell committed the unauthorized practice
11  of law – a criminal offense - on at least two separate occasions.

12    199.   Most dangerously, Defendant Fackrell represented to the Slobigs that
13  as retailers of children's toys, they could not be sued if a toy they sold caused
14  injury to a child.

15    200.   This representation was not only wrong, but potentially exposed the
16  Slobigs to extensive liability and undermined the public policy of strict products
17  liability.

18    201.   On another occasion, Defendant Fackrell directed the Slobigs to
19  commit a violation of the U.S. Copyright Act, by using photographs as advertising
20  copy to which they did not have a license.

21    202.   When the Slobigs specifically questioned Defendant Fackrell as to
22  whether such an action would be copyright infringement, Defendant Fackrell
23  represented to them – wrongly – that it would not be.

24    203.   Moreover, on multiple occasions Defendant Fackrell knowingly gave
25  the Slobigs confusing advice in the hopes of enticing them to purchase future
26  services.

27
28

1

204.   For instance, Defendant Fackrell was aware of the fact the Slobigs did

2   not understand the concept of "dropshipping" as it related to a business of their

3   volume.

4

205.   Defendant Fackrell was also aware that the Slobigs were already

5   having trouble meeting the time demands of their modest volume.

6

206.   Fully understanding that dropshipping services were not yet advisable

7   for a business such as the Slobigs', Defendant Fackrell nevertheless used the

8   Slobigs' lack of understanding of the concept to entice them to purchase a $12,500

9   "Dropship" package that promised "dropshipper access" and additional

10   "coaching."

11

207.   This purchase occurred in the fall of 2013.

12

208.   Because the Slobigs did not understand or need dropshipping, and

13   received little additional coaching beyond the questionable advice they were

14   already receiving, they received negligible value for this $12,500 amount.

15

209.   As this conduct continued throughout the fall of 2013, the Slobigs

16   began to pose increasingly complex and detailed questions to EBS representatives.

17

210.   During this period, Mr. Slobig began to become concerned that Mr.

18   Fackrell was not taking the Slobigs' business and concerns as seriously as he

19   purported to be.

20

211.   However, Mr. Fackrell maintained with Mrs. Slobig what she believed

21   to be a friendly, positive, relationship.

22

212.   Meanwhile, he was disparaging them in file notes – including, for

23   instance, calling them "conspiracy theorists."

24

213.   After learning that the Slobigs had settled upon children's toys and

25   furniture as a retail niche, Mr. Fackrell often mentioned his family and children in

26   conversation with Mrs. Slobig, and intentionally led her to believe that a personal

27   family-friend relationship was developing.

28

214. Fackrell's manipulation of the Slobigs was successful enough that while he was conspiring to induce them into paying Defendants even more money and deepening themselves in the scam, the Slobigs were choosing gift(s) from their prospective inventory of toys to send to Fackrell's children.

215. Meanwhile, the Slobigs' business continued to flounder, and did not show improvement.

216. During this period, despite being aware of the time and effort being put into their business by the Slobigs, EBS representatives consistently maintained that success for the Slobigs was right around the proverbial corner if they persisted in following EBS' advice.

217. When EBS' advice failed at various turns, EBS would blame Mrs. Slobig's purported lack of familiarity with computers and berate her for the same, despite the fact that she is an accomplished author who is not unfamiliar with technology.

218. EBS employed this strategy intentionally, and tailored it specifically for Mrs. Slobig in light of its awareness of her emotional and physical state, brought on by her recent illness.

219. Mrs. Slobig, who was initially falsely told the program would only require 6-10 hours a week, became exhausted by the "rat race " and enormous time commitment, which was the equivalent of a full time job, if not more.

220. Nonetheless, she was (and is) a determined and indefatigable worker, who never quits.  As a result, her experience drove her to the point of a nervous breakdown.

221. Mrs. Slobig is historically a person who, like most adults, needs 8-9 hours of sleep nightly for optimal functioning.  At the peak of Defendants' scheme, however, she received a mere fraction of that amount, due both to the required time commitment and due to insomnia brought on by the stress inflicted upon her.

222.   Mrs. Slobig's chronic insomnia is ongoing due to the stress brought about by Defendants' betrayal of her family and the resulting damage to her and her husband's finances, including the loss of their retirement fund.

223.   Defendants' conduct therefore caused severe emotional distress.

224.   During the peak of Defendants' scheme, Mr. Fackrell would often imply that Mrs. Slobig, in particular, simply needed to work harder to succeed, knowing that she was emotionally invested in her inventory and customers, and the act of serving the community through running a small business.

225.   In fact, Mrs. Slobig is a diligent and thorough person who was pushed to the limit and ended up spending 10-12 hours per day expending tremendous energy on completing Mr. Fackrell's "assignments".

226.   However, unbeknownst to the Slobigs, these "assignments" were not designed and intended to improve the Slobigs' business, but rather to increase the amount of time, energy, and money they invested in Defendants' system, making it more likely that they would continue to spend more on Defendants' "coaching."

227.   That the Slobigs would have to spend vastly more time and money on Defendants' program than Defendants represented to them at various points was intentional and a central aspect of Defendants' own profit-generation model.

228.   When Mrs. Slobig, in particular, became suspicious, or embarked upon a line of questions Mr. Fackrell did not desire to answer, he would often change the subject by referencing his own family and children, all the while being aware of Mrs. Slobig's affinity for the same.

229.   The conduct of intentionally forcing a medically vulnerable 72 year-old retired breast-cancer survivor into a position where she must run herself ragged in pursuit of success that EBS knew would never come, and turning every suspicion back on her, is the sort of emotional manipulation that transcends mere deceptive conduct to the point that it is extreme and outrageous.

1    230.   This manipulation is reflected throughout the email exchanges
2    between Mrs. Slobig and various EBS representatives.

3    231.   Although this strategy was outrageous, it was also effective; by early
4    2014, as the Slobigs' complete lack of success persisted and their remaining
5    "coaching hours" waned (meaning EBS would cease regular, frequent contact with
6    them), EBS began marketing another upsell.

7    232.   Because of the extent to which it manipulated the Slobigs, EBS was
8    able to convince them to purchase more coaching via its false representation that
9    one more set of coaching success would be just enough to push them over the top
10   into profitability, despite the fact that it knew otherwise.

11   233.   In reliance upon this false hope planted by EBS, in January 2014, the
12   Slobigs purchased the "Gold Marketing Package," a package of ten additional
13   coaching sessions no different from the valueless services they had already
14   purchased, for $4800.00.

15   234.   For this last payment, the Slobigs did not even receive the illusory
16   non-value they had received previously: on or around February 13, 2014, the
17   Federal Trade Commission shut down EBS and procured a U.S.  District Court
18   order temporarily freezing its assets.

19   235.   EBS did not accurately disclose to the Slobigs why they had ceased
20   operation so suddenly, and intentionally created a false impression about what had
21   occurred.

22   236.   The message conveyed to the Slobigs on February 13, 2014 referred
23   to the closure as the result only of "unforeseen circumstances."

24   237.   In light of the legal proceedings that had been initiated against various
25   principals of Defendants, there was nothing "unforeseen" the FTC action.

26   238.   Representatives of EBS did not admit to the Slobigs what had actually
27   occurred until March 24, 2014.  Even then, they referred to the FTC action merely
28   as "a lawsuit that was wrongfully taken up against us", and did not mention that the

SLOBIGS' COMPLAINT; Demand for Jury Trial

1  "lawsuit" was a federal enforcement action targeted specifically at EBS and the
2  Sonnenberg RICO conspiracy.

3      239.   Specifically, an EBS/Supplier Source employee named Trevor Shipp
4  represented to the Slobigs via email on March 24, 2014 that "our clients are sent do
5  (*sic.*) us via over a hundred different outside sales companies.  One of those sales
6  companies had allegedly broken some telemarketing laws, resulting in a
7  subsequent FTC investigation.  We were tied into that investigation because we
8  had done business with this company.  After a thorough investigation, we have
9  since been released."

10     240.   The above representations were almost entirely false.  The FTC
11  investigation in question was not focused on solely on telemarketing violations, but
12  rather on the systematic defrauding of vulnerable consumers – the precise conduct
13  experienced by the Slobigs.  That some Defendant co-conspirators scammed
14  consumers via telemarketing pitches while others scammed consumers via online
15  banner ads is not a material distinction.

16     241.   EBS and Supplier Source were not tied into the investigation "because
17  they had done business" with FTC defendants, but rather because they were central
18  members of a massive RICO conspiracy to defraud consumers through the sale of
19  illusory business consulting "services."

20     242.   Moreover, Mr. Shipp did not disclose that the vast majority of the
21  "over a hundred different sales companies" with which his employer did business
22  were simply shell companies, owned by the same core RICO conspirators, most or
23  all of whom are named as Defendants in both this Complaint and the FTC RICO
24  action.

25     243.   Finally, Mr. Shipp's representation that his employer had been
26  "released" from the investigation was also false: the investigation has not
27  concluded, the federal case arising therefrom is still pending, and the FTC's claims

28

SLOBIGS' COMPLAINT; Demand for Jury Trial

1  against EBS and the individual RICO defendants have not been dismissed, either

2  voluntarily or otherwise.

3      244.   The result of these misrepresentations was to give the impression that

4  EBS/Supplier Source was merely at the periphery of another actor's wrongdoing,

5  when in fact the investigation centered specifically on its acts of fraud, and the

6  RICO conspiracy perpetrated by the Common Enterprise Defendants using the

7  entity – and their "over a hundred" other entities – to shield themselves.

8      245.   As previously alleged, Defendants EBS and Sonnenberg referred the

9  Slobigs to several of their co-conspirator Defendants almost immediately upon

10 learning that the Slobigs were willing to pay large sums of money in pursuit of

11 establishing a successful business.

12     246.   At the center of the network of co-conspirators was Defendant

13 DAEUS, which served no function and provided no services to the Slobigs other

14 than referring them to other Defendants, who would then defraud them in turn.

15     247.   One of the services that Defendant DAEUS purported to offer (as

16 represented by itself, Defendant Nicholas Welch, and Defendant EBS) was

17 assistance with raising capital to support the Slobigs' business.

18     248.   In purporting to fulfill this function, DAEUS connected the Slobigs

19 with Defendants Aragon and SEED Capital.

20     249.   Together, Defendants DAEUS, SEED CONSULTING, LLC, Nicholas

21 Welch, and Aragon represented to the Slobigs that they would raise a minimum of

22 $50,000.00 in capital for the Slobigs' business, using methods such as solicitation

23 of venture capital contributions from investors and establishing lines of business

24 credit with reputable financial institutions.

25     250.   Furthermore, Defendants represented that such fundraising would be

26 done exclusively on behalf of and in the name of the Slobigs' business entity,

27 Serve Ventures, LLC.

28

SLOBIGS' COMPLAINT; Demand for Jury Trial

251.   Specifically, on November 12, 2013, DAEUS' employee, Defendant Jeffery Warren, sent an email to the Slobigs with the subject line, "Welcome to Daeus Business Builder".

252.   This email promised to "walk" the Slobigs "through the steps necessary to build up a very strong business credit score and obtain substantial funding for your business."

253.   These "steps necessary" interspersed valid but self-explanatory advice such as "set up a business entity" and "[d]ecide which bank you want to open an account with" with upsells for services that were not "necessary" in any objective sense, including but not limited to virtual office services, internet business phone services, 411 listing services, internet fax services, website & email address hosting services, and credit monitoring services.

254.   Finally, the email of November 12, 2013, included a discussion of the impact of personal credit on ability to obtain business financing, and offered to assist the Slobigs in improving their "<u>personal credit scores</u>" (emphasis in original) in order to benefit their business.

255.   This discussion included the statement "[w]e know that one of the main reasons you are building business credit is to get away from having all of the business financing tied personally to you as the business owners."

256.   The Slobigs reasonably relied on these representations in agreeing to engage with Defendants DAEUS and SEED Capital, particularly because they had a strong desire – of which Defendants were aware – to avoid taking actions that would jeopardize their personal finances or personal credit rating or other credit worthiness.

257.   The Slobigs questioned whether participation in such a capital campaign was necessary or appropriate for them, because they did not feel that they required $50,000.00 in capital in order to establish their business.

SLOBIGS' COMPLAINT; Demand for Jury Trial

258.   Indeed, the Slobigs' business model did not call for a minimum of $50,000.00 in capital.

259.   Defendants, however, insisted that the Slobigs would have use for such an amount, and that such a mark would be easy for Defendants to meet.

260.   In reliance upon these representations, the Slobigs authorized Defendants to raise capital on behalf of Serve Ventures, LLC, and only the LLC.

261.   But Defendants did not secure any capital on behalf of Serve Ventures, LLC.

262.   Moreover, Defendants did not open lines of credit on behalf of Serve Ventures, LLC.  Instead, without authorization, Defendants opened eight different lines of credit in the name of Frank Slobig, *personally*.

263.   Specifically, Defendants opened lines of credit with the following institutions:

| a.  American Express | $3,000.00 |
|---|---|
| b.  Ameriprise Financial | $15,500.00 |
| c.  Bank of America | $15,000.00 |
| d.  Capital One | $7,500.00 |
| e.  Citi Thank You | $9,500.00 |
| f.  Citi Diamond | $7,000.00 |
| g.  M&T Bank | $8,500.00 |
| h.  USAA Rewards | $10,000.00 |
| **TOTALS** | $76,000.00 |

264.   These lines of credit accounted for more than $76,000 for which the Slobigs are *personally responsible*, rather than responsible via their business entity, Serve Ventures, LLC.

SLOBIGS' COMPLAINT; Demand for Jury Trial

1       265.   Of these lines of credit, one – Amex – was never activated.

2       266.   A second line of credit- Capital One – was cancelled (and payments

3 restored) after the Slobigs presented evidence of Defendants' fraud to that

4 company.

5       267.   Letters were written on behalf of the Slobigs about the other six lines

6 of credit, requesting reconsideration of the amount owed and/or to reduce

7 payments.

8       268.   The Slobigs continue their efforts to mitigate their damages.

9       269.   In order to mitigate as best as possible the damage to their personal

10 credit, the Slobigs have continued to make minimum payments on these six active

11 lines.

12     270.   As a direct result of Defendants' fraud, the Slobigs are now saddled

13 with more than $76,000 in debt that they cannot discharge in bankruptcy without

14 doing severe, permanent damage to their personal credit.

15     271.   As detailed in the allegations above, Plaintiffs have been defrauded by

16 a common enterprise of affiliated associations in-fact of faux business consulting

17 services and the individuals behind their corporate veils.

18     272.   Although the Common Enterprise Defendants typically act through

19 their respective business entities, which purport not be affiliated, they have a

20 personal association, from which their scheme springs.

21     273.   Defendants specifically target their fraud at elderly and retired

22 individuals who they know hope to supplement fixed incomes with part-time

23 entrepreneurism.

24     274.   The Federal Trade Commission has already sued many of the

25 Defendants for their participation in the business services fraud racketeering

26 conspiracy alleged in this Complaint.  This case is No.  2:14-cv-00088 pending in

27 the United States District Court for the District of Utah.

28

SLOBIGS' COMPLAINT; Demand for Jury Trial

275. At one point during that case, the court imposed an asset freeze upon Defendants and appointed a temporary receiver in relation thereto.

276. Plaintiffs are not the only individuals to be victimized by Defendants' racketeering conspiracy.

277. Defendants' online business coaching scam has been in operation and garnering consumer complaints online since at least 2012, and even earlier using other "shell" companies even before that.

278. For instance, a consumer described Defendants' pitch as of March 5, 2013 – made by an individual he identified as "Simon" – as follows:

> He told me the requirements for this program are:
>
> • To spend only about 10-15 hrs/per week on the computer on line
>
> • To be teachable
>
> • To invest some money (only money makes money)
>
> • And to be able to make decisions quickly
>
> *. He talked about drop shipping, affiliate marketing, described a perfect product, explain SEO – Search Engine Optimization for my web site and many more."

279. According to this consumer, "Simon" described a payment schedule similar to that into which the Slobigs ultimately were defrauded:

> He then wanted me to draw a line on the paper and mark the Day 1 (when I invest $6,895), Day 30 (when I pay only minimum payment roughly $120 but to make $800), Day 60 to make another minimum payment of $120 but make $2100) Day 90 to make minimum payment of $120 but make $3-4,000) and finally Day120 to make a minimum payment and make 97% of my investment. […]He then told me that this is a proven business and they would teach me how to make lots of money in short time.   Being without the job, almost desperate, I believed the guy that this could actually work.   All I have to do is follow their instructions.  I thought myself there are probably lots of people making good money on-line selling products.  It seemed to be a good opportunity so I gave the guy my American Express card

number and let him charge me **$6,895.00** only because he verbally guaranteed an income.

He stayed with me the whole time while I was signing the contract and when I stumbled at the sections that stated 'I agree that no claims of future earnings have been presented to me by any representative of the company, and that they do not represent I will earn any specific amount of money' because I would not get into this program if I do not make money, he said that this is just standard wordage and he personally guarantee I make money with them, he just can say if it's $5,000 or $20,000/ months – that will depend on me.

280.   This consumer then continued on to describe Defendants' "coaching" experience as "very disappointing" with "no positive direction". The consumer stated that "there is no real coaching to the program" and that "the coach has no clue how to make money at all."

281.   Similarly to the misrepresentations made by Mr. Fackrell to the Slobigs, this consumer's coach also pointed to seemingly fictitious "other clients" as examples of success to ward off suspicions about Defendants' scheme – as described by that consumer:

A month later, to support his "coaching" my coach provided me with someone else user name (dacaamch) to check his activity on e-Bay. Yet my coach did not have any information on this client as where he gets the merchandise from or how much he actually profits from selling on e-Bay and told me he was a client of another coach. He could not provide a user name of his own client. The only thing I could find out was this person's activity (only 20% successful sell of all listings).

282.   This consumer then described as experience eerily similar to that of the Slobigs:

On March 12, 2013 Mike Olaski from different affiliated business, Daeus Financial, called me and explained to me a need for LLC – Limited Liability Company. He explained that while offering merchandise on e-Bay is a good strategy for start the ultimate financial security comes from drop shipping and affiliated companies. In that case I would need:
• Protection
• Corporate Credits
• And tax deductions to write up all start up expenses
• He also explained to me that without LLC I would not be able to drop shipping and other types of activities that provide a lot more opportunities.

"On March 27, 2013 James introduced himself calling from another affiliate company – Supplier Search LLC and explained to me that

SLOBIGS' COMPLAINT; Demand for Jury Trial

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

without their help I will not be able to do drop shipping and I would limit myself only to sell on e-Bay.  Knowing that making money on e-Bay is hard and I could not support myself (or supplement my regular income) and focusing just on getting my money back I agreed that drop shipping would probably get me out of dept *(sic.)* faster.

283.   On October 4, 2012, another consumer described an experience with "Mike Olaskey" of "Daeus Financial", and accused Defendant DAEUS of peddling illusory liability "protection" and providing bad legal advice, despite not being a law firm.

284.   On October 5, 2012, the same consumer made similar comments about Defendant Strategic Tax Services, to which he was introduced – like the Slobigs – by Defendant DAEUS.

285.   Also on October 5, 2012, a consumer complained about illusory business support services offered by Defendant Your Entity Solutions.

286.   Indeed, as noted above, Your Entity Solutions has already been sued for its involvement in a similar scheme to defraud the elderly, involving telemarketing calls.

287.   Another consumer described in detail in 2012 the same deceptive $50,000 business financing representation made by DAEUS to the Slobigs in 2013:

Alec Eskander phones me and begins the 'coaching' session.  He goes over the importance of obtaining a business credit portfolio, the urgency of removing all the business related expenses I've recently incurred from my personal credit, and how he 'can' help me do that w/in 30 - 60 days for the reasonable rate of $5095.00 (which will include my very own, customized e-commerce business website).  He does offer me the option of attempting to research and establish business credit on my own, however assures me the 'daunting' task is very overwhelming to an inexperienced, new business owner like myself, and the average COST to obtain such financing (w/out the included e-commerce business website which is included in the Daeus deal) begins at a minimum of $6000.00.  I state that this process does not EVEN make sense however Alec assures me that it WOULDN'T make sense due to my very limited knowledge in this type of business because I am so new, however that is why he has the know how and Daeus has the people to make it happen FOR me.  He assures me that with my high personal credit score, it's almost absolute that business financing with a credit limit of $50K can be arranged at 0% interest, and that going with Daeus is the 100% 'safest' way to start the process'.  Fear and intimidation win over $3500.00 billed to credit

1
2
3

card. (the additional $1595.00 will be processed through an additional email sent from an affiliate website designer/hosting company)  Alec will call me in roughly 2 weeks to make another 'coaching' appointment and see how 'things are going.''  This follow up calls never happens. (*sic.*)

4    288.   This consumer continued:

5
6
7
8

I receive a call from yet another 'coach' named Jimmy Beech.   This person sounds like he's drunk and on drugs.   He can't complete a full sentence as every other word is 'uhhh', 'huhh', 'what'?  The phone receiver is constantly being covered and I hear muted laughter.   He manages to inform me that there are 6 more steps I need to complete in order to complete the Corporate Credit process and that he will email me the worksheet.   I ask him who the financing company is who this credit will be obtained through.   He tells me it will be going through Seed Capital located in Nevada. (*sic.*)

9
10

289.   This consumer's experience with Defendant DAEUS ended with an

11

email from Defendant stating: "We can still help you proceed forward.  The best

12

thing to do at this point is work on paying down your personal credit cards and

13

work with your credit coaches to look at all other options."

14

290.   Consumers online have described difficulty unwinding which of the

15

Defendant entities are associated with which, indicating that Defendants used

16

names such as "Power Seller College", "Members Learning Source", "DAEUS

17

Financial", "YES", and others interchangeably.

18

291.   Indeed, consumer complaints on

19

http://www.utahconsumeradvocate.com have indicated that Defendant entities and

20

their corresponding Defendant owners have shared the use of various trade names

21

for their purported services, offering various consumers similar iterations of the

22

same scam that victimized the Slobigs.

23

292.   For instance, one such report from May 2014 references the

24

"Coaching Department" and "EBS", similar to the Slobigs' experience.  However,

25

that consumer received representations that EBS and Defendant YES were the

26

*same entity*.

27

293.   However, several months after making the corresponding

28

representations to the Slobigs, Defendants represented the acronym YES as

standing not for "Your Entity Solution", but instead as standing for "Your Ecommerce Support".

294.   On information and belief, Defendants used such trade names interchangeably amongst each other, because they did not describe actual services, but were merely buzzwords designed to deceive consumers into falling victim to their scam – which was the same every time: to convince victims to invest ever-increasing amounts of money in pursuit of financial success that would never come.

295.   The individual Defendants' mutual use of these terms is a product of the association-in-fact in which they were engaged under the cover of their respective corporate entities.

296.   Each of these various aliases plays a role in the individual Defendants' association in fact used by them to perpetrate widespread mail and wire fraud.

297.   For instance, Defendants make use of over 300 different bank accounts in the names of their various shell corporations, and hundreds of different merchant identification numbers.

298.   Defendants use these accounts interchangeably in order to hide their pattern of conduct from regulators, banks, credit card companies, and the public at-large.

299.   For instance, many consumers – including the Slobigs – have noticed that the entities to which credit card payments to Defendants were credited were often different entities than those with which they believed they had engaged, with names they did not recognize.

300.   Another consumer described an experience that occurred in early 2013 that was identical to that which occurred to the Slobigs:

> I signed up to learn how to start a business online selling products.  Was immediately contacted by Daeus and told I needed them so I wouldn't be sued They are affiliated with other companies that are scamming people out of money. 3/25/13 I signed up to learn a business online.  Was contacted by daeus immediately.  Said I thought too soon, I haven't even had coaching yet.

Said we need to get right on it-it will take weeks to get taxpayer ID#. In the meantime, the other entity which I will file a report on too, Put all my credit cards over the limit, debited my account of $17,500 without my authorization and ruined my credit. Daeus is no good to me now, no bank is going to let me open a business account $30,000 in debt with cards that I can't pay off. Daeus and the affiliate were suppose to help me get my business going, instead they've run me in the ground." (*sic.*)

301.   The role of SEED Capital in this conspiracy was also a consistent theme is online consumer complaints about Defendants:

Each entity provided by Daeus Financial, cost initial set-up fees and ongoing monthly funds.  The first thing they wanted to know was my credit limit and how much I owed on all of my credit cards.  Also, they asked for my credit score.  They called this program an "LLC set up fee" with an initial cost of $1815.  They claimed that this must be done in order to be protected online.  After that, I realized that I had racked up a lot of debt on my personal credit cards and they told me about their program to transfer my personal debt over to a corporate credit.  This charge was $2000 which they made all kinds of promises about the validity of their services and what it would do for my financial situation.  Nothing else happens until you submit a 6 Step Worksheet.  Then a call comes from Seed Capital, LLC promising to set up multiple credit card accounts.  Thank goodness I spoke with an advisor on this and learned the high APR rate to follow if I signed up with them.  Today, I am embarrassed by not having researched these companies; deeply in debt; and no closer to having a viable website capable of paying back this debt.  Before this financial disaster, I was debt free with a high credit score." (*sic.*)

302.   Another consumer account describes an experience from later in 2013, and is one of several to complain about being overcharged by several hundred dollars for the formation of an LLC:

Thought I was getting into making extra money by posting links on websites, instead my number was sold, and I fell for high pressure sales tactics.  On 6/23/13 is was contacted by Daeus Financial, on behalf of the Coaching Program about my business entity session, which they said was included, which I took to be included in the $4495 from the coaching program. I talked to **** about the differences between a Sole proprietorship and an LLC.  He talked about how most students have four or five websites so they have up to four LLC's , because if you decide to purchase one LLC for I believe it was $1500.  He said I would pay more in the long run so they make the $3555 four 4 LLCS, package sound better.  High pressure and naiveté won -and I purchased the $3550.00 package using most of my savings because my credit card was maxed.  I checked.  It only takes $180.00 to start an LLC in my state.

303.   Other consumers have described high pressure sales tactics regarding purchase of "dropshipper" services – the illusory service which Defendant EBS

SLOBIGS' COMPLAINT; Demand for Jury Trial

scammed the Slobigs into paying $12,500 in order to purchase, but which provided no significant benefit to their business.

304.   Interestingly, the "dropshipper" scam is a consistent theme across the illusory service offered by various Defendants – in addition to being raised by Defendant EBS (as was the case with the Slobigs), Defendants DAEUS and SEED CONSULTING, LLC have also been accused of pushing "dropshipping" as a means to extract thousands of dollars from the victims of their conspiracy – mostly business owners without the volume to justify the cost.

305.   Moreover, accounts of Defendants' pricing vary as between each other and that experienced by Plaintiff despite similar services being provided, indicating that Defendants' fees are not based upon any sort of inherent value but rather upon what the potential mark is assessed as likely willing to pay.

306.   The consistency and frequency of the above-described accounts, and dozens of others available on consumer review sites such as ripoffreport.com, indicate that Defendants have engaged in a consistent pattern of fraud since at least 2012, in a manner virtually identical to that seen even earlier than 2012 in the *Apply Knowledge* and *Ivy Capital* cases.

307.   The FTC *Apply Knowledge* action alleges and presents evidence of the existence of the same association in fact as alleged herein.

308.   Plaintiffs have paid a total of at least $41,652 in fees to various Defendant entities for services not rendered, in reliance upon Defendants' various above-referenced deceptive representations and conduct.

309.   Plaintiffs have also become indebted in amounts exceeding $50,000.

310.   Plaintiffs made the following four payments, totaling $24,492, to Defendant E-Business Solutions:

        a.   $97 on July 30, 2013;

        b.   $7,095 on August 7, 2103;

        c.   $12,500 on September 3, 2013; and

SLOBIGS' COMPLAINT; Demand for Jury Trial

d. $4,800 on February 1, 2014.

311.   Plaintiffs made the following three payments, totaling $10,050, to Defendant DAEUS Financial:

      a. $3,560 on August 19, 2013, for Defendant Your Entity Solutions

      b. $2,990 on August 30, 2013, for Defendant Strategic Tax Services

      c. $3,500 on November 7, 2013.

312.   Plaintiffs made the following four payments, totaling $6,990 to Defendant SEED Capital:

      a. $495 on December 20, 2013

      b. $495 on December 20, 2013

      c. $3,000 on January 8, 2014

      d. $3000 on January 15, 2014

313.   Plaintiffs made a variety of smaller and sometime recurring payments to various entities as part of the completion of various "homework assignments" given them by EBS and DAEUS.

314.   As a result of the above-alleged conduct of Defendants DAEUS and SEED Capital and their associated individual Defendants, eight lines of credit were opened in Mr. Slobig's name without his authorization, six of which are still active with balances that total in excess of $54,225.70, divided approximately as follows:

| Credit Card Issuer | Debt | Paid | Balance |
| --- | --- | --- | --- |
| Ameriprise | $15,350.00 | $2,156.35 | $13,193.65 |
| Bank of America | $14,000.00 | $1,496.00 | $12,504.00 |
| CITI Diamond | $6,500.00 | $995.00 | $5,505.00 |
| CITI Thank You | $8,800.00 | $1,235.00 | $7,565.00 |
| M&T Bank | $7,900.00 | $683.02 | $7,216.98 |
| USAA | $9,300.00 | $1,058.93 | $8,241.07 |
| TOTALS | $61,850.00 | $7,624.30 | $54,225.70 |

SLOBIGS' COMPLAINT; Demand for Jury Trial

1

315.   The Slobigs continue to pay on the balances on these credit cards.

2

316.   In order to mitigate damage to their credit, the Slobigs have paid at

3

least $7,624.30 on these balances – a sum that continues to accrue as the Slobigs

4

make monthly payments on the debt.

5

317.   Of the eight lines of credit fraudulently opened by SEED Capital, only

6

one – Capital One – was closed when the provider was notified of the

7

circumstances under which it was opened.

8

318.   As a result of Defendants' conspiracy, Mr. Slobig's credit rating has

9

lost over 175 points on his FICO score, which was almost perfect before being

10

victimized by Defendants

11

319.   As a result of Defendants' conspiracy, the entirety of the Slobigs'

12

current monthly disposable income is diverted to payments on various debts arising

13

from Defendants' fraud.

14

320.   The Slobigs' lifestyle has been materially altered by Defendants'

15

scheme.  Where before the Slobigs traveled the country in their retirement, often

16

camping in a trailer in State and National parks while renting their Washington,

17

DC, house in order to pay its property taxes, now they are unable to afford the

18

basic expenses of such travel - leaving them unable to afford an apartment and  -

19

essentially stranded in Los Angeles in a family member's extra bedroom - with

20

nowhere to call home.

21

321.   As a proximate cause of the anxiety and emotional abuse inflicted

22

upon Mrs. Slobig by Defendant E-Business Solutions before, during, and after

23

being confronted with its conduct, Mrs. Slobig has suffered recurring medical

24

issues requiring outpatient treatment.

25

322.   In particular, Mrs. Slobig has suffered from chronic sleep deprivation,

26

extreme stress and anxiety resulting in heart arrhythmia and tachycardia, as well as

27

recurring periodic digestive disorder, as a direct result of the stress inflicted upon

28

SLOBIGS' COMPLAINT; Demand for Jury Trial

her by Defendants in general and by Defendants EBS, Sonnenberg, and Fackrell in particular.

323.   This condition came about as a proximate result of the exacerbating effects that the abuse, emotional distress, and stress inflicted upon Mrs. Slobig by Defendants on her previously existing heart condition.

324.   Defendants were aware of this heart condition, and of Mrs. Slobig's weakened health due to breast cancer, before engaging in the majority of the conduct giving rise to this Complaint.

325.   Mr. Slobig has also experienced extreme emotional distress as a proximate result of Defendants' conduct, in the form of aggravation, stress, worry, and sleep deprivation, which has manifested itself physically.

326.   Defendants' conduct has had a profound impact upon the lives and lifestyles of the Slobigs, whose finances have been ruined and whose retirement has been dominated by the deleterious effects of Defendants' fraud.

327.   Plaintiffs bring this suit seeking compensation for all of the extensive harm, including but not limited to the damages enumerated above, that Defendants have inflicted upon them through misrepresentations, unconscionable acts, and otherwise abusive behavior targeted specifically at the elderly and others on fixed income.

## FIRST CAUSE OF ACTION

### VIOLATION OF UTAH CODE ANN. § 13-11-4 (DECEPTIVE ACTS AND PRACTICES) AS TO ALL DEFENDANTS

328.   Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully stated herein.

329.   Utah Code Ann. § 13-11-4(1) provides, in pertinent part, "[a] deceptive act or practice by a supplier in connection with a consumer transaction violates this chapter whether it occurs before, during, or after the transaction."

330.   As detailed throughout this Complaint, Defendants engaged in an extended campaign of manipulation and misinformation directed at the Slobigs for the sole purpose of convincing them to invest in illusory business consulting services that provided no value to them.

331.   This campaign included a litany of express misrepresentations made by Defendants, many – but not all – of which are detailed in this Complaint.

332.   As part of this broader deception, Defendant E-Business Solutions, through its employee, Jason Fackrell, made numerous misrepresentations that are more particular.

333.   Specifically, in addition to those detailed below with regards to enumerated deceptive practices committed, Defendant EBS made the following deceptive statements in violation of Utah Code Ann.  § 13-11-4(1):

    a. The central misleading representation made by EBS, and every other Defendant, was that the EBay resale model proposed by EBS could ever be profitable for a couple like the Slobigs.

       i. The margins on reselling consumer goods on internet auction sites are extremely small, and it is therefore difficult if not impossible for such a venture to turn a profit without sufficient volume to cover overhead.

      ii.   Any entity that reasonably purports to offer online small business consulting services would be aware of the profit margins for such transactions, the volume required to turn a profit, and labor required to meet that volume.

      iii.   Therefore, E-Business Solutions' representation to the Slobigs – a couple it knew to be retired and in their 70s - that they could earn substantial income with a 6-10 hour-per-week investment in time was a representation it knew to be false.

b.  Defendant's representation that "all" of Mr. Fackrell's "clients" ran successful Ebay resale businesses under his "coaching" was false.

c.  Defendant's representation that the FTC investigation concerned merely "a company [it] did business with" was false.

d.  Defendant's representation that it had been "released" from the FTC investigation was false.

e.  Including false testimonials either never made or, on information and belief, made in exchange for compensation.

334.  As detailed throughout this Complaint, Defendant DAEUS committed numerous deceptive acts and practices against Plaintiffs in its attempts to induce them to pay fees both to itself and to entities belonging to other friends and co-conspirators of Defendant Nicholas Welch.

335.  The most egregious deceptive conduct in which Defendant DAEUS engaged was its participation, to whatever extent, in the fraudulent opening of eight lines of personal credit in Plaintiffs' name without their knowledge or authorization, after premising its engagement with them on the concept of separating personal and business credit obligations.

336.  Specifically, Defendant DAEUS violated Utah Code Ann. § 13-11-4(1) in the following ways:

a.  DAEUS' claims regarding so-called "corporate" credit are false. The services offered by DAEUS involve efforts to repair personal credit using sham EIN and corporate numbers from the undercapitalized sham corporations set up by DAEUS or one of its affiliated entities.

b.  DAEUS' claims regarding seeking capital on behalf of its clients, and introducing them to well-established "investors" were also false.

SLOBIGS' COMPLAINT; Demand for Jury Trial

1
2
3

       c.  Furthermore, DAEUS made numerous false representations about the nature and quality of the services offered by the co-conspirator organizations to which it referred Plaintiffs and others.

4
5
6

337.  As detailed throughout this complaint, Defendant SEED Capital committed numerous deceptive acts and practices against Plaintiffs in its attempts to induce them to pay fees and participate in its personal credit scheme.

7
8

338.  Specifically, Defendant SEED Capital violated Utah Code Ann. § 13-11-4(1) in the following ways:

9
10

       a.  Defendant misrepresented the tactics it would engage in to raise "capital" on behalf of Plaintiffs.

11
12
13
14

       b.  Defendant promised that it would establish lines of credit on behalf of Plaintiffs' business entity, Serve Ventures LLC, when it fact it intended to (and did in fact) open lines of credit in Plaintiffs' own name.

15
16

       c.  Defendant opened these lines of credit without Plaintiffs' knowledge or authorization.

17
18

339.  This line of conduct amounts to a pattern of deceptive acts and practices committed by Defendant against Plaintiffs.

19
20
21

340.  Defendant made these misrepresentations and engaged in this conduct intending that the Slobigs rely upon the fabricated image of Defendant as a reputable venture-capital firm.

22
23
24

341.  The Slobigs did, in fact, rely upon these misrepresentations in engaging with, and continuing to do business with, Defendant and other related Defendants.

25
26

342.  Defendant Your Entity Solutions made the following deceptive statements in violation of Utah Code Ann. § 13-11-4(1):

27
28

SLOBIGS' COMPLAINT; Demand for Jury Trial

a.  Representing that the cost of forming an LLC in the State of California was several thousand dollars, when in fact it was a few hundred.

b.  Representing that it has merely an arms-length relationship with Defendants EBS and DAEUS when in fact it is a sham entity run by co-conspirators in Defendants' RICO conspiracy.

343.  Utah Code Ann. § 13-11-4(2)(a) prohibits statements that indicate "that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not."

344.  Defendant EBS violated Utah Code Ann. § 13-11-4(2)(a) in the following ways:

a.  Including in its online banner advertisements the logos of reputable news organizations with which it had no sponsorship, approval, or affiliation.

b.  Representing that its "coaches" had been trained as coaches through "coaching college," type program – a program that was illusory and consisted of little more than familiarization with the sophisticated marketing and solicitation scripts that Defendant used to convince marks to purchase "services".

345.  Defendant DAEUS violated Utah Code Ann. § 13-11-4(2)(a) in the following ways:

a.  By representing itself as a business credit consultant when it actually provided personal credit repair services in violation of the Credit Repair Organizations Act.

b.  Representing the purchase of various specific services offered by its partners and/or affiliates as "necessary" to build a successful business, and as a prerequisite to receiving Defendant's "services" despite those services having already been paid for.

SLOBIGS' COMPLAINT; Demand for Jury Trial

346.   Utah Code Ann. § 13-11-4(2)(b) prohibits statements that indicate "that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not."

347.   Defendant EBS violated Utah Code Ann. § 13-11-4(2)(b) in the following ways:

        a.   Including false testimonials either never made or, on information and belief, made in exchange for compensation.

        b.   Making the aforementioned representations regarding its associates' "coaches college" experience.

348.   Utah Code Ann. § 13-11-4(2)(I) prohibits statements that indicate that "the supplier has a sponsorship, approval, or affiliation the supplier does not have"

349.   Defendant EBS violated Utah Code Ann. § 13-11-4(2)(I) in the following ways:

        a.   Including in its online banner advertisements the logos of reputable news organizations with which it had no sponsorship, approval, or affiliation.

        b.   Representing that its "coaches" had completed **[coach's college],** an illusory program that consisted of little more than familiarization with the sophisticated marketing and solicitation scripts that Defendant used to convince marks to purchase "services."

350.   All of these representations were made in connection with consumer transactions.

351.   Defendants made these misrepresentations intending that the Slobigs rely upon them.

352.   The Slobigs did, in fact, rely upon these misrepresentations in engaging with, and continuing to do business with, Defendants and other related Defendants.

353.   Moreover, Defendant E-Business Solution's conduct was a component in a broader racketeering scheme, involving crimes including but not limited to mail fraud, designed to ensnare small business owners and induce them into making an ever-increasing series of illusory investments.

354.   This conduct amounts to a months-long pattern of deceptive acts and practices perpetrated by Defendants upon the Plaintiffs.

355.   Defendants' conduct offends numerous public interests, including but not limited to:

        a.   The public interest in preventing systematic consumer fraud, pyramid schemes, and the like deceptively promising illusory future benefit in exchange for exorbitant up-front fees;

        b.   The public interests in preventing mail and wire fraud;

        c.   The public interest in preventing elder abuse scams; and

        d.   The public interest in combating criminal racketeering conspiracies related to each of the above.

356.   Utah Code Ann. § 13-11-19 provides for a private right of action for the recovery of actual damages and attorneys' fees for persons injured by a defendant's violation of §13-11-4.

357.   Plaintiffs sustained actual damages as a proximate result of Defendants' conduct, including but not limited to fees paid as a result of fraud, damage to personal credit, aggravation, emotional distress, illness, and physical injury.

## SECOND CAUSE OF ACTION

### VIOLATION OF UTAH CODE ANN.  § 13-11-5
### (UNCONSCIONABLE ACTS AND PRACTICES)

### AS TO ALL DEFENDANTS

358.    Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully stated herein.

359.    Utah Code Ann.  § 13-11-5(1) provides, in pertinent part, "[a]n unconscionable act or practice by a supplier in connection with a consumer transaction violates this act whether it occurs before, during, or after the transaction."

360.    By engaging in the conduct alleged throughout this Complaint, Defendants perpetrated an intentional, sophisticated RICO scheme upon Plaintiffs designed to extract as much money as possible by preying on their financial vulnerability, need for supplemental income, and trusting nature.

361.    In pursuit of this scheme, Defendants committed a litany of unconscionable acts and practices in violation of Utah Code Ann.  § 13-11-5(1).

362.    These acts and practices were committed with the intent that they further Defendants' fleecing of Plaintiffs' savings.

363.    These acts and practices were committed by Defendants with knowledge of the Slobigs' financial and medical circumstances, and in many instances depending upon those circumstances to be successful.

364.    Specifically, Defendant EBS committed the following unconscionable practices:

    a.  The Slobigs had no previous experience with sites such as EBay; however, they settled on this model at E-Business Solutions' urging.

SLOBIGS' COMPLAINT; Demand for Jury Trial

b.  However, E-Business Solutions' advice was not sound – and E-Business Solutions was aware of this fact at all times relevant to this Complaint.

c.  Under E-Business Solutions' "coaching", the Slobigs never earned enough revenue to justify the mounting expenses imposed upon them by Defendants.

d.  Moreover, contrary to EBS' representations, the Slobigs' business often required 60 hours per week or more in time investment, just to stay afloat.

e.  Throughout the period relevant to the Complaint, EBS gave the Slobigs a variety of misleading or otherwise illegal advice – including unauthorized legal advice, detailed below – which worsened the Slobigs' position.

f.  Moreover, E-Business Solutions was aware that its business model was not working for the Slobigs, because its "coaches" were in close contact with the Slobigs, via email and telephone, for much of the initial period of the engagement.

g.  Indeed, EBS' own internal correspondence indicated that they believed the Slobigs "struggle with the stupidest things." A copy of this correspondence is attached as Exhibit 2.

h.  Yet, rather than warn the Slobigs off the plainly unsuccessful path they were heading down – as it was required to do under the Enrollment Agreement and in mitigation of its earlier false statements – EBS actively encouraged them to continue on, collecting thousands of dollars more in fees in the process and proximately causing far more in damages.

365.  Specifically, Defendant DAEUS committed the following unconscionable practices:

a.  Accepting payments for credit repair services up-front in violation of the Credit Repair Organizations Act.

b.  After accepting such payments, conditioning provision of its "services" on the "perfect" completion of a "homework assignment" that required the purchase of several additional services offered by Defendant, its partners, or affiliates.

366.   Specifically, Defendant SEED CONSULTING, LLC committed the following unconscionable practices:

a.  Holding itself out as a "venture capital" firm when it had no intention of engaging in venture capital fundraising on behalf of the Slobigs, and causing significant damage to their credit while simultaneously assuring them that "capital" is being raised.

b.  Opening 8 lines of credit in Frank Slobig's name, personally, without his knowledge or authorization.

c.  Any other relief that this Court deems reasonable and just.

## THIRD CAUSE OF ACTION

### VIOLATION OF NEV.  REV.  STAT.  § 598.09 *et seq.*  - (DECEPTIVE TRADE PRACTICES)

### AS TO NEVADA DEFENDANTS

367.   Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully stated herein.

368.   Plaintiffs re-allege and incorporate all of the factual allegations in Counts I and II of this Complaint as if fully state herein

369.   NRS 598.0915 prohibits, among other conduct,

1) knowingly making a false representation as to the source, sponsorship, approval or certification of goods or services for sale or lease;

2) knowingly making a false representation as to affiliation, connection, association with or certification by another person;

3) knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith; 4) making false or misleading statements of fact concerning the price of goods or services for sale or lease, or the reasons for, existence of or amounts of price reductions; 5) knowingly making any other false representation in a transaction.

370.   As alleged throughout this Complaint, Defendant SEED CONSULTING, LLC knowingly made, directed Defendant DAEUS to make, or ratified numerous misrepresentations about the nature of the DAEUS credit repair scheme, that constitutes a prohibited act as defined by NRS 598.0915.  These representations include, but are not limited to:

    a. The representation that SEED CONSULTING, LLC would solicit investment capital on behalf of the Slobigs from its network of "top lenders," when SEED CONSULTING, LLC had no intention of soliciting such investment and had no network of "top lenders."

    b. The representation that DAEUS and SEED CONSULTING, LLC offered business credit repair services, when in fact those services were personal credit repair services.

    c. The representation that any capital or credit secured, and any loans taken out, would be done so in the name of the Slobigs' business entity, Serve Ventures, LLC, when in fact SEED CONSULTING, LLC intended merely to open substantial lines of credit in the name of Frank Slobig, personally.

    d. The representation that SEED CONSULTING, LLC would improve the Slobigs' personal credit by moving personal credit

SLOBIGS' COMPLAINT; Demand for Jury Trial

debts over to business credit, when in fact it intended to and did damage the Slobigs' personal credit by incurring more personal credit debt on their behalf without authorization.

371. NRS 598.0917 prohibits the use of "bait and switch advertising," defined in pertinent part as "an offer to sell or lease goods or services which the seller or lessor in truth may not intend or desire to sell or lease, accompanied by […]; 3. Requiring other sales or other undisclosed conditions to be met before selling or leasing the advertised goods or services."

372. Defendant SEED CONSULTING, LLC, both by itself and through Defendant DAEUS, offered to and represented that it would assist the Slobigs in securing some capital investment for their business, but had no intent of doing so.

373. Both DAEUS and SEED CONSULTING, LLC required the Slobigs to complete "homework" assignments that often required the purchase of additional services from them and from affiliates.

374. Defendant SEED CONSULTING, LLC required a capital campaign goal of $50,000 to be raised using Plaintiff's credit despite Plaintiffs' protestations that such a large amount was not necessary or desired.

375. None of the above-referenced conditions was disclosed prior to the Slobigs' payment of fees to the respective Defendants.

376. Defendants made these misrepresentations intending that the Slobigs rely upon them.

377. The Slobigs did, in fact, rely upon the above-referenced misrepresentations in engaging with, and continuing to do business with, Defendant and other related Defendants.

378. NRS 598.0923 provides, in pertinent part, that "[a] person engages in a 'deceptive trade practice' when in the course of his or her business or occupation

1   he or she knowingly: […] 3.  Violates a state or federal statute or regulation
2   relating to the sale or lease of goods or services."

3       379.   As alleged in Counts V and VI, herein, Defendants' personal credit
4   repair scheme violated 15 U.S.C. §1679, *et seq.*, the Credit Repair Organizations
5   Act ("CROA").

6       380.   As alleged throughout this Complaint, Defendants' CROA violations
7   were knowing and intentional.

8       381.   Therefore, Defendants have violated NRS 598.0923.

9       382.   The above-referenced conduct was all committed in the course of
10  Defendants' business or occupation.

11      383.   Moreover, Defendants' conduct was related to a broader racketeering
12  scheme, involving crimes including but not limited to mail fraud, designed to
13  ensnare small business owners and induce them into making an ever-increasing
14  series of illusory investments.

15      384.   This conduct amounts to a months-long pattern of deceptive acts and
16  practices perpetrated upon the Slobigs by a conspiracy in which Defendant SEED
17  CONSULTING, LLC took part.

18      385.   Defendants' conduct offends numerous public interests, including but
19  not limited to:

20          a.   The public interest in preventing systematic consumer fraud,
21               pyramid schemes, and the like deceptively promising illusory
22               future benefit in exchange for exorbitant up-front fees;

23          b.   The public interests in preventing mail and wire fraud;

24          c.   The public interest in preventing elder abuse scams;

25          d.   The public interest in preventing credit repair organization abuses;
26               and

27          e.   The public interest in combating racketeering conspiracies related
28               to each of the above.

SLOBIGS' COMPLAINT; Demand for Jury Trial

386.   Plaintiffs sustained actual damages as a proximate result of Defendant's conduct, including but not limited to fees paid as a result of fraud, damage to personal credit, aggravation and emotional distress, and personal injuries sustained by the Slobig.

387.   Nev. Rev. Stat. § 41.600(3) provides for a private right of action for the recovery of actual damages and attorneys' fees for persons injured by a defendant's violation of NRS 598.0915 to 598.0925, inclusive.

## FOURTH CAUSE OF ACTION

### VIOLATION OF 18 U.S.C. §1962(c). (RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT [RICO])

### AS TO RICO DEFENDANTS

388.   Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully stated herein.

389.   The "RICO Defendants" are Defendants KEN SONNENBERG, DAVID BEVAN, JESSICA BJARNSON, PHILIP GANNUSCIA, THOMAS RISKAS, BABATA SONNENBERG, NICOLAS WELCH, WENDY BYFORD, and GARY BAUER.

390.   Each of Plaintiffs is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

391.   Each of the RICO Defendants is a "person" within the meaning of 18 U.S.C. § 1961(3).

392.   The association-in-fact described by the Temporary Receiver in the FTC action cited herein, and alleged above, is an enterprise related to the marketing of purported internet business consulting services.

393.   E-Business Solutions, DAEUS Financial, and other related entities referenced herein, although components of the RICO Defendants' association-in-

fact, are also enterprises established for such purposes, independently of each other.

394.   Defendant Sonnenberg, in concert with the other RICO Defendants, conducted and/or participated in a scheme to defraud aspiring part-time small business entrepreneurs out of thousands of dollars in fees for illusory services that were never and in some cases could never have been provided, and which Sonnenberg had no intention of providing.

395.   At all times relevant to this Complaint, the enterprises described herein were engaged in, and their activities affected, interstate commerce.  The facilities of interstate commerce include the United States mails, highways, and telephone, modern internet, and facsimile lines.

396.   Defendant Sonnenberg and the other RICO Defendants, on numerous occasions, used or caused to be used, interstate telephone wires in furtherance of, and for the purpose of executing the scheme to defraud.  The use of the wires includes, but is not limited to:

    a.  Telephone calls made to Plaintiffs by Defendants or their employees in which false representations were made, as described in Section B, above.

    b.  Making numerous other false representations to Plaintiffs via email, all as alleged herein.

    c.  Placing or causing to be placed deceptive internet banner advertisements that purported to offer business consulting services for the price of $97, when such "services" consisted entirely of efforts to upsell more expensive, and also illusory, "coaching" packages.

397.   FEach use of interstate wires in connection with the scheme to defraud constitutes the offense of wire fraud as proscribed and prohibited by 18 U.S.C. § 1343.

398.   These uses of interstate mails and wires were also done in order to commit fraud in violation of Utah Code Ann. § 13-11-4.

399.   The criminal activities described above were all done in furtherance of Defendants' scheme to defraud.

400.   Continuity is established because the predicate acts were committed against numerous consumers over a period of at least two to three years, since early 2012, as evidenced by the litany of accounts described in Section C, above.

401.   Continuity is also established by the evidence presented in the Receiver's Report attached as Exhibit 2 which describes how Defendants' operation was a high-volume one for which he had developed a comprehensive process for committing fraud across many successful attempts over a long period of time.

402.   Defendant's conduct therefore constitutes a violation of 18 U.S.C. §1962(c).

403.   Plaintiffs were directly injured by Defendants' violations of 18 U.S.C. §1962(c).

## FIFTH CAUSE OF ACTION

### VIOLATION OF 15 U.S.C. §1679b
### ( THE CREDIT REPAIR ORGANIZATIONS ACT)

**AS TO DEFENDANTS NICOLAS WELCH, DANIEL WELCH, JEFFREY WARREN, RANDY J. LANG,  JEFFREY SPANGLER, and DAEUS FINANCIAL**

404.   Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully stated herein.

405.   A person or persons violate 15 U.S.C. §1679b-(a)(1) if they:

make any statement, or counsel or advise any consumer to make any statement, which is untrue or misleading (or which, upon the exercise of reasonable care, should be known by the credit repair organization, officer, employee, agent, or other person to be untrue or misleading) with respect to any consumer's credit worthiness, credit standing, or credit capacity to—
(A) any consumer reporting agency (as defined in section 1681a (f) of this title); or
(B) any person—
(I) who has extended credit to the consumer; or

(ii) to whom the consumer has applied or is applying for an extension of credit;"

406.   A person or persons violate 15 U.S.C. §1679b-(a)(2) if they:

make any statement, or counsel or advise any consumer to make any statement, the intended effect of which is to alter the consumer's identification to prevent the display of the consumer's credit record, history, or rating for the purpose of concealing adverse information that is accurate and not obsolete to—
(A) any consumer reporting agency;
(B) any person—
        (I) who has extended credit to the consumer; or
        (ii) to whom the consumer has applied or is applying for an extension of credit;"

407.   A person or persons violate 15 U.S.C. §1679b-(a)(3) if they "make or use any untrue or misleading representation of the services of the credit repair organization"

408.   A person or persons violate 15 U.S.C. §1679b-(a)(4) if they "engage, directly or indirectly, in any act, practice, or course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization."

409.   15 U.S.C. §1679b-(b) provides: "No credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed."

410.   As alleged throughout this complaint, Defendant DAEUS purports to offer credit  "enhancement" services, strategies, and counseling.

411.   According to DAEUS, these strategies include not only "building" a "business" credit profile, but also improving personal credit, and "shielding" personal credit by bringing personal liabilities under the auspices of a shell business entity.

412.   Furthermore, the broad RICO conspiracy in which DAEUS's strategies played a part purports to offer supplemental personal household income

1  to consumers, and therefore concerns personal household credit no matter

2  Defendants' attempts to counsel customers to hide behind corporate entities.

3       413.   Therefore, Defendant DAEUS is a "credit repair organization" as that

4  term is defined by 15 U.S.C. §1679a-3.

5       414.   As alleged throughout this Complaint, upon solicitations made by

6  Defendant Nicholas Welch and other DAEUS employees, and upon the

7  recommendation and referral of the EBS/Sonnenberg Defendants, Plaintiffs paid

8  thousands of dollars to enroll in DAEUS' credit repair program, the details of

9  which are particularized above.

10      415.   Plaintiffs are "consumers" as defined by 15 U.S.C. §1679a-1.

11      416.   Plaintiffs are not the only consumers who have been counseled under

12  Defendant's credit repair program.

13      417.   As one consumer posted on www.scambook.com on 8/29/13:

14         That's when Daeus stepped in.  These people are such pros at scamming you its
15         pathetic.  They call and tell you that in order to protect your personal assets, you
            need an LLC set up in case they are sued by a consumer for any products you list
            that are sold...next comes $1800 for corporate credit assistance to move all the
16         credit card charges you have racked up...

17      418.   Another consumer posted on this site on 5/20/13:

18         I am in a 'coaching' program for a new internet business.  I was flooded
           with phone calls from all their associates that were pushing me to sign up
19         in order to make money.  I was supposed to get corporate credit from
           Daeus.

20
21      419.   On 10/23/13 a consumer wrote:

22         Daeus charged me $3,500 on 10/30/13 for building my business credit.  I was
           told that Daeus would help me get corporate credit.  They had all kinds of 'steps'
           that I had to finish (credit report, FICO scores... Daeus Financial has done
23         nothing to help me get corporate credit.  Daeus is a scam.

24      420.   DAEUS' claims regarding so-called "corporate" credit are false.  The

25  services offered by DAEUS involve efforts to repair personal credit using sham

26  EIN and corporate numbers from the undercapitalized sham corporations set up by

27  DAEUS or one of its affiliated entities.

28

SLOBIGS' COMPLAINT; Demand for Jury Trial

421.    Defendant violated 15 U.S.C. §1679b-(a)(1) because it counseled consumers to make statements that it knew or reasonably should have known were untrue or misleading regarding the consumers' credit worthiness, credit standing, or credit capacity, to credit reporting agencies, persons who have extended credit to the consumers, and/or persons to whom the consumers have applied or are applying for an extension of credit.

422.    Defendant violated 15 U.S.C. §1679b-(a)(2) because it counseled consumers to make statements the intended effects of which were to alter the consumers' identification to prevent the display of the consumer's credit record, history, or rating for the purpose of concealing adverse information that is accurate to credit reporting agencies, persons who have extended credit to the consumers, and/or persons to whom the consumer have applied or are applying for an extension of credit.

423.    Defendant violated 15 U.S.C. §1679b-(a)(3) because it made numerous untrue and misleading representations about its services, summarized in the First Cause of Action, and elsewhere, in this Complaint.

424.    Defendant violated 15 U.S.C. §1679b-(a)(4) because it engaged directly in practices and a course of business that constituted and resulted in the commission of fraud and deception on Plaintiffs and other consumers in connection with the offer or sale of its credit repair services, summarized in the First Cause of Action, and elsewhere, in this Complaint.

425.    Defendant violated 15 U.S.C. §1679b-b because it required payment for its services – in the amount of thousands of dollars charged for "coaching" – to be paid up-front, not only before its services were fully performed, but before performance would even begin.

426.    15 U.S.C. §1679g establishes a private right of action for consumers who have either been damaged by or paid money to a credit repair organization that has violated any provision of the Credit Repair Organizations Act.

427.   Defendant's noncompliance is frequent because, on information and belief, Defendant utilizes the same or substantially similar sales pitches and credit "enhancement" counseling for each consumer with whom it engages.

428.   Defendant's noncompliance is persistent, because on information and belief, Defendant has used the above-described practices consistently for at least the past five years.

429.   Defendant's noncompliance was intentional.

430.   Defendant's noncompliance was not only for the purpose of deceiving potential creditors of Defendant's clients, but also for the purpose of deceiving the clients themselves, by bilking them out of thousands of dollars for personal credit repair services packaged fraudulently as "corporate" credit.

431.   Hundreds, or possibly thousands, of consumers – all of Defendant's clients over its life - have been caught up in Defendant's credit repair scam.

432.   Plaintiffs sustained actual damages as a proximate result of Defendant's conduct, including but not limited to fees paid as a result of fraud, damage to personal credit, aggravation and emotional distress, and personal injuries sustained by Judy Slobig.

## SIXTH CAUSE OF ACTION

### VIOLATION OF 15 U.S.C. §1679b
### (THE CREDIT REPAIR ORGANIZATIONS ACT )
### AS TO DEFENDANTS KARI ARAGON; ERIK GANTZ SEED CONSULTING, LLC

433.   Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully stated herein.

434.   A person or persons violate 15 U.S.C. §1679b-(a)(1) if they:

make any statement, or counsel or advise any consumer to make any statement, which is untrue or misleading (or which, upon the exercise of reasonable care, should be known by the credit repair organization, officer, employee, agent, or other person to be untrue or misleading) with respect to any consumer's credit worthiness, credit standing, or credit capacity to—

(A) any consumer reporting agency (as defined in section 1681a (f) of this title); or

(B) any person—

(I) who has extended credit to the consumer; or

(ii) to whom the consumer has applied or is applying for an extension of credit;"

435.   A person or persons violate 15 U.S.C. §1679b-(a)(2) if they:

make any statement, or counsel or advise any consumer to make any statement, the intended effect of which is to alter the consumer's identification to prevent the display of the consumer's credit record, history, or rating for the purpose of concealing adverse information that is accurate and not obsolete to—

(A) any consumer reporting agency;

(B) any person—

(i) who has extended credit to the consumer; or
(ii) to whom the consumer has applied or is applying for an extension of credit;"

436.   A person or persons violate 15 U.S.C. §1679b-(a)(3) if they "make or use any untrue or misleading representation of the services of the credit repair organization"

437.   A person or persons violate 15 U.S.C. §1679b-(a)(4) if they "engage, directly or indirectly, in any act, practice, or course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization."

438.   15 U.S.C. §1679b-(b) provides: "No credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed."

439.   As alleged throughout this complaint, Defendants KARI ARAGON; ERIK GANTZ, and  SEED CONSULTING, LLC purport to offer the same or

1  substantially similar credit  "enhancement" services, strategies, and counseling as
2  Defendant DAEUS.

3      440.   As with the DAEUS scheme, these strategies include not only
4  "building" a "business" credit profile, but also improving personal credit, and
5  "shielding" personal credit by bringing personal liabilities under the auspices of a
6  shell business entity.

7      441.   Both SEED CONSULTING, LLC (doing business as "Seed Capital")
8  and DAEUS represent to prospective clients, as they did to the Slobigs, that they
9  will raise investment "capital" on the clients' behalf, when in reality both SEED
10 CONSULTING, LLC and DAEUS intend only to open lines of personal credit in
11 the clients' names.

12     442.   Indeed, on information and belief, the amount of "capital" both SEED
13 CONSULTING, LLC and DAEUS claim they will raise on behalf of clients is
14 always the same - $50,000 – no matter what sort of business the client operates or
15 the capital needs of that business.

16     443.   Furthermore, DAEUS referred the Slobigs directly to SEED
17 CONSULTING, LLC so that, in this particular instance, SEED CONSULTING,
18 LLC could carry out the very credit repair scam outlined by DAEUS in the
19 literature it provided to the Slobigs.

20     444.   Therefore, Defendant SEED CONSULTING, LLC is a "credit repair
21 organization" as that term is defined by 15 U.S.C. §1679a-3.

22     445.   As alleged throughout this Complaint, upon the recommendation and
23 referral of DAEUS as part of DAEUS' credit repair program, Plaintiffs paid fees to
24 SEED CONSULTING, LLC in order to secure its services as part of the program,
25 the details of which are particularized above.

26     446.   Upon being retained by the Slobigs, as alleged above, SEED
27 CONSULTING, LLC proceeded without authorization to open 8 lines of personal

28

SLOBIGS' COMPLAINT; Demand for Jury Trial

1  credit in Frank Slobig's name, to which charges related Defendants' various scams
2  could be applied.

3       447.   This had the effect not of improving the Slobigs' credit, but of
4  effectively destroying it.

5       448.   Plaintiffs are "consumers" as defined by 15 U.S.C. §1679a-1.

6       449.   Defendant violated 15 U.S.C. §1679b-(a)(1) because it counseled
7  consumers to make statements that it knew or reasonably should have known were
8  untrue or misleading regarding the consumers' credit worthiness, credit standing,
9  or credit capacity, to credit reporting agencies, persons who have extended credit to
10 the consumers, and/or persons to whom the consumers have applied or are
11 applying for an extension of credit.

12      450.   Defendant violated 15 U.S.C. §1679b-(a)(2) because it counseled
13 consumers to make statements the intended effects of which were to alter the
14 consumers' identification to prevent the display of the consumer's credit record,
15 history, or rating for the purpose of concealing adverse information that is accurate
16 to credit reporting agencies, persons who have extended credit to the consumers,
17 and/or persons to whom the consumer have applied or are applying for an
18 extension of credit.

19      451.   Defendant violated 15 U.S.C. §1679b-(a)(3) because it made
20 numerous untrue and misleading representations about its services, as alleged
21 throughout this Complaint.

22      452.   These misrepresentations include but are not limited to: 1) the
23 misrepresentation that SEED CONSULTING, LLC would seek investment capital
24 on behalf of the Slobigs when in fact it intended to seek only lines of personal
25 credit; and 2) the misrepresentation that any loans, credit, or other capital procured
26 would be done so in the name of the Slobigs' business entity so that their personal
27 credit would remain insulated from such actions, when in fact it intended to and

28

did exclusively open up lines of personal credit in Frank Slobig's name, or with Frank Slobig as a co-signer.

453.   Defendant violated 15 U.S.C. §1679b-(a)(4) because it engaged directly in practices and a course of business that constituted and resulted in the commission of fraud and deception on Plaintiffs and other consumers in connection with the offer or sale of its credit repair services, as alleged throughout this Complaint.

454.   Defendant violated 15 U.S.C. §1679b-b because it required payment for its services to be paid up-front, not only before its services were fully performed, but before performance would even begin.

455.   15 U.S.C. §1679g establishes a private right of action for consumers who have either been damaged by or paid money to a credit repair organization that has violated any provision of the Credit Repair Organizations Act.

456.   Defendant's noncompliance is frequent because, on information and belief, Defendant utilizes the same or substantially similar sales pitches and credit "enhancement" counseling for each consumer with whom it engages.

457.   Defendant's noncompliance is persistent, because on information and belief, Defendant has used the above-described practices consistently for at least the past five years.

458.   Defendant's noncompliance was intentional.  Defendant's noncompliance was not only for the purpose of deceiving potential creditors of Defendant's clients, but also for the purpose of deceiving the clients themselves, by bilking them out of thousands of dollars for personal credit repair services packaged fraudulently as "corporate" credit.

459.   Hundreds, or possibly thousands, of consumers have been caught up in Defendant's credit repair scam.

460.   Plaintiffs sustained actual damages as a proximate result of Defendant's conduct, including but not limited to fees paid as a result of fraud,

damage to personal credit, aggravation and emotional distress, and personal injuries sustained by Judy Slobig.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Frank Slobig and Judy Slobig, by and through their attorneys, respectfully pray for the following relief as the following respective groups of Defendants:

1.      As to the jointly and severally liable "Common Enterprise Defendants" including Defendants Ken Sonnenberg; David Bevan; Jessica Bjarnson; Philip Gannuscia; Chad Huntsman; Thomas Riskas; Babata Sonnenberg; Jason Fackrell; Austin Bawden; Trevor Shipp; James Ryan; Nicolas Welch; Daniel Welch; Jeffery Warren; Wendy Byford; Gary Bauer; Martin Pettit; Kari Aragon; Randy Lang; Jeffery Spangler; Erik Gantz; E-business Solutions, Llc; Daeus Financial; Apply Knowledge, Llc; Evertex Solutions; Your Entity Solution, Llc; Supplier Source, Llc; Seed Consulting, LLC; Strategic Tax Services; and Gaytan, Baumblatt, & Leevan, Llp, on the First and Second Causes of Action:

      A.      An award of actual damages including pecuniary and non-pecuniary damages, including but not limited to personal injuries and damages to personal credit.

      B.      An award of punitive damages;

      C.      An award of reasonable attorney fees and costs; and

      D.      Any such other relief that this Court deems appropriate and just under the circumstances.

2.      As to Defendants Ken Sonnenberg, David Bevan, Jason Fackrell, Austin Bawden, Trevor Shipp, James Ryan, Nicolas Welch, Jeffery Warren, Wendy Byford, Martin Pettit, Business Solutions, Llc, Daeus Financial, Apply Knowledge, Llc, Evertex Solutions, Your Entity Solution, Llc, Supplier Source, Llc, and Strategic Tax Services for their own conduct alleged in the First and Second Causes of Action:

SLOBIGS' COMPLAINT; Demand for Jury Trial

A.     An award of actual damages including pecuniary and non-pecuniary damages, including but not limited to personal injuries and damages to personal credit.

B.     An award of punitive damages;

C.     An award of reasonable attorney fees and costs; and

D.     Any such other relief that this Court deems appropriate and just under the circumstances.

3.     As to Defendants Kari Aragon; Erik Gantz; and SEED CONSULTING, LLC on the Third Cause of Action:

A.     An award of actual damages,

B.     An award of punitive damages

C.     An award of reasonable attorney fees and costs; and

D.     Any such other relief that this Court deems appropriate and just under the circumstances.

4.  As to the jointly and severally liable "RICO Defendants" including Defendants Ken Sonnenberg; David Bevan; Jessica Bjarnson; Philip Gannuscia; Thomas Riskas; Babata Sonnenberg; Nicolas Welch; Wendy Byford; and Gary Bauer on the Fourth Cause of Action:

A.     An award of treble damages,

B.     An award of reasonable attorney fees and costs; and

C.     Any such other relief that this Court deems appropriate and just under the circumstances.

5.  As to Defendant DAEUS FINANCIAL and the individual defendants on the Fifth Cause of Action:

A.      An award of actual damages,, including but not limited to damages to personal credit and fees paid in reliance upon fraudulent misrepresentations;

B.      An award of punitive damages

C.      An award of reasonable attorney fees and costs; and

D.      Any such other relief˙ that this Court deems appropriate and just under the circumstances.

6.      As to Defendant SEED CONSULTING, LLC and the individual defendants on the Sixth Cause of Action:

A. An award of actual damages, including but not limited to damages to personal credit and fees paid in reliance upon fraudulent misrepresentations;

B. Punitive damages;

C. An award of reasonable attorney fees and costs; and

D. Any such other relief˙ that this Court deems appropriate and just under the circumstances.

Dated: May 19, 2015            Respectfully submitted,


                               By:    */s/ Grenville Pridham*
                                      Grenville Pridham
                                      Christopher V. Langone
                                      James P. Batson

                               Attorneys for Plaintiffs,
                               FRANK SLOBIG and JUDY SLOBIG

# DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, the Slobigs demand a trial by jury of all issues that may be tried to a jury in this action.

Dated: May 19, 2015                    Respectfully submitted,


By:     */s/ Grenville Pridham*
        Grenville Pridham
        Christopher V. Langone
        James P. Batson

Attorneys for Plaintiffs,
FRANK SLOBIG and JUDY SLOBIG

SLOBIGS' COMPLAINT; Demand for Jury Trial